## UNITED STATES v. BRUNETT et al.
### No. 10978.

District Court, W. D. Missouri, W. D. Oct. 16, 1931.

Albert E. Brunett and the Ukiah Grape Products Company were indicted for selling and possessing for sale a preparation, compound, or substance designed and intended for use in the unlawful manufacture of intoxicating liquor. Each defendant found guilty on various counts as indicated in the opinion.

Thomas J. Layson, Asst. U. S. Atty., and William L. Vandeventer, U. S. Atty., both of Kansas City, Mo.

Benedict A. Leerburger, of New York City, and Leslie J. Lyons and Donald E. Lyons, both of Kansas City, Mo., for defendants.

OTIS, District Judge.

### I. The Indictment.

A grand jury in the St. Joseph division on September 23, 1931, returned an indictment in thirty counts charging defendants with various offenses against the National Prohibition Act (27 USCA). Prior to trial, the government dismissed counts IV, VIII, XII, XVI, XX, XXIV, XXV, XXIX, and XXX. The twenty-one remaining counts are in seven groups, the first consisting of counts I, II, and III, the second of counts V, VI, and VII, the third of counts IX, X, and XI, the fourth of counts XIII, XIV, and XV, the fifth of counts XVII, XVIII, and XIX, the sixth of counts XXI, XXII, and XXIII, and the seventh of counts XXVI, XXVII, and XXVIII.

Each count charges a violation of section 30, title 27, U. S. C. (27 USCA § 30) which is: "It shall be unlawful to advertise, manufacture, sell, or possess for sale any utensil, contrivance, machine, preparation, compound, tablet, substance, formula, direction, or recipe advertised, designed, or intended for use in the unlawful manufacture of intoxicating liquor."

All counts in the first five groups charge that defendants sold a preparation, compound, and substance designed and intended for use in the unlawful manufacture of intoxicating liquor. The counts in groups 6 and 7 charge that the defendants possessed for sale a preparation, compound, and substance designed and intended for use in the unlawful manufacture of intoxicating liquor.

Count I is: "The grand jurors of the United States of America, duly and legally chosen, selected, summoned and drawn from the body of the Western District of Missouri, and duly and legally empaneled, sworn and charged to inquire of and concerning crimes

and offenses against the United States in the Western District of Missouri, upon their oaths present and charge that on or about the 20th day of October, 1930, at and near 3001 Forest Avenue, in Kansas City, Jackson County, Missouri, in the Western Division of the Western District of Missouri, one Albert E. Brunett, and one Ukiah Grape Products Company, a corporation duly incorporated and existing under and by virtue of the laws of the State of New Jersey, then and there being, did then and there unlawfully, wilfully, and knowingly, and in violation of the National Prohibition Act, sell to one Roy C. Shively, a certain preparation, compound and substance, to-wit, about 10 gallons of specially prepared concentrate, previously manufactured from grape juices and capable of producing wine, which said specially prepared concentrate was then and there designed and intended by the said Albert E. Brunett and the said Ukiah Grape Products Company for use by the said Roy O. Shively, in the unlawful manufacture of wine without a permit as required by the National Prohibition Act, as amended and supplemented: Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

Count II differs from count I only in that, whereas count I charges that the preparation, compound, and substance sold was intended to be used in the manufacture of wine, count II charges that it was intended to be used in the manufacture of a vinous liquor, intoxicating in fact. Count III differs from count I only in that, whereas count I charges that the preparation, compound, and substance sold was designed and intended for use in the unlawful manufacture of wine, count III charges that it was designed and intended for use in the manufacture of a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume.

The counts in groups 2, 3, 4, and 5 are identical with the counts in group 1, except that in each group a sale to a different person on a different date is charged.

Count XXI, the first in group 6, is: "And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that on or about the 19th day of January, 1931, the exact date being to these grand jurors unknown, at the railway express agency located at the union station, in Kansas City, Jackson County, Missouri, in the Western Division of the Western District of Missouri, one Albert E. Brunett and one Ukiah Grape Products Company, a corporation duly incorporated and existing under and by virtue of the laws of the state of New Jersey, then and there being, did then and there unlawfully, wilfully and knowingly, and in violation of the National Prohibition Act, possess for sale on the open market, a certain preparation, compound and substance, to-wit, about 150 gallons of specially prepared concentrate, previously manufactured from grape juices, and capable of producing wine, which said specially prepared concentrate was then and there designed and intended by the said Albert E. Brunett and the said Ukiah Grape Products Company for use, by purchasers thereof, in the unlawful manufacture of wine, without a permit as required by the National Prohibition Act, as amended and supplemented: Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

Count XXII differs from count XXI only in that, whereas count XXI charges that the defendants possessed for sale a preparation, compound, and substance designed and intended by the defendants for use by purchasers in the unlawful manufacture of wine, count XXII charges that the preparation, compound, and substance was designed for use by purchasers in the unlawful manufacture of a vinous liquor, intoxicating in fact. Count XXIII differs from count XXI only in that, whereas count XXI charges that the defendants possessed for sale a preparation, compound, and substance designed and intended by the defendants for use by purchasers in the unlawful manufacture of wine, count XXIII charges that the preparation, compound, and substance was designed for use by purchasers in the unlawful manufacture of a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume.

The counts in the seventh group are identical with the counts in the sixth group, excepting that they refer to a possession for sale by the defendants at a different time and of a different quantity of the alleged preparation, compound, and substance.

## II. Demurrer to the Indictment.

Each of the defendants filed a demurrer to each of the counts of the indictment, setting up that none of them states facts constituting a crime. The demurrers were overruled. I set out here the points which defendants made in support of their demurrers and my reasons for concluding they were meritless. It is necessary to refer only to

counts I and XXI. If they state facts constituting crimes, undoubtedly the other counts are not vulnerable.

Defendants assert that count I is bad, first, in that it does not charge that the product sold was intoxicating in fact; second, in that it does not charge how the unlawful manufacture was to be effected; and, third, in that it does not charge that the product sold was not to be used in the home of the purchaser.

The theory of the defendants is that although, speaking generally, count I may charge a crime under section 30, nevertheless in this instance it does not, for that it does not negative a defense which might be made under section 46, which last section relieves from the penalties of the National Prohibition Act one who manufactures nonintoxicating cider and fruit juices for exclusive use in his home. There is no merit in this theory as a ground for a demurrer. The rule is that an indictment which sets out the facts stated by one section of a statute to constitute a crime need not negative the facts which might, under another section or some other statute, constitute a defense. 31 Corpus Juris, 720. If the defendants' theory is applicable to an indictment based on section 30, it is applicable also to an indictment based on other sections of the National Prohibition Act prohibiting the manufacture of intoxicating liquors. It would be necessary in every such indictment to allege that the intoxicating liquor charged to have been manufactured was not a nonintoxicating cider or fruit juice manufactured by one for exclusive use in his home.

It is true that count I does not charge that the product therein alleged to have been sold by the defendants was designed and intended to be used in the manufacture of a liquor intoxicating in fact. But section 30 prohibits the sale of a product to be used in the unlawful manufacture of intoxicating liquor. The term "intoxicating liquor" in section 30 means liquor containing more than one-half of 1 per cent. of alcohol by volume, irrespective of whether it is intoxicating in fact.

It is true that count I does not charge how the unlawful manufacture was to be effected. Certainly it need not charge the manner of manufacture. It matters not what is the manner if there is manufacture. Defendants contend that what is done by the purchaser of their product is not manufacture. Whether it is is to be determined from the facts in evidence and not by requiring the plaintiff to plead evidence in its indictment from which it may be determined before trial.

It is true that count I does not charge that the product sold was to be used in the home of the purchaser. But there is nothing in section 30 which makes any reference to the place, whether in the home of a purchaser or elsewhere, where the manufacture is to occur. Certainly the government was not required to charge as an element of the offense what is not made one by the statute.

The theory of the defendants is that count XXI charges no offense, for that, although it charges that the defendants possessed for sale a preparation, compound, and substance designed and intended by them for use in the unlawful manufacture of intoxicating liquor, and therefore attempts to charge an offense in the very words of the statute, nevertheless no offense is charged, for that the mere possession for sale of preparations, compounds, and substances designed and intended for use in the unlawful manufacture of intoxicating liquor cannot be an offense. The defendants say that the mere possession of what may be a lawful preparation, compound, or substance, coupled with an intent that it shall be sold for use in an unlawful manufacture, is not enough—that there must be some overt act in addition to these elements. As defendants put it in their brief: "The law has never sought to punish sinful thinking persons. It seeks to extend its arms to malefactors, that is, persons doing wrong."

The simple answer to this is that section 30 does make it an offense merely to possess for sale preparations, compounds, and substances with the intent and design that they shall be used for unlawful manufacture. The attack then really is not upon the indictment, which follows the statute, but upon the validity of the statute. But the validity of the statute is presumed. It is valid if it was in the constitutional power of Congress to enact it. Quite clearly it was within the power given by the Eighteenth Amendment, but whether it was or not is not a question that can be raised by a demurrer, which neither asserts the invalidity of a statute nor points to any provision of the Constitution violated by it.

It is not true, however, that this statute denounces as a crime a mere mental state without external acts effectuating, or seeking to effectuate, intent and purpose. It is not mere possession that is condemned. It is

possession for sale. Proof of mere possession does not prove possession for sale. A charge of possession for sale and proof thereof both involve the conception of some external act, as the display of the thing possessed, the advertising of the thing possessed, the holding out in some way of the thing possessed for sale. These are overt acts. They are charged when it is charged that the thing possessed was possessed for sale. If they are not charged with particularity, and if the accused desired particulars, their remedy was by a motion for a bill of particulars and not by demurrer.

III. Motion for Return of Papers and Documents and for the Suppression of Evidence.

At about 11 a. m., January 17, 1931, special agents of the Department of Justice entered the office of the defendant Albert E. Brunett at 609 Waltower building, Kansas City, Mo., which was also the local office of the defendant Ukiah Grape Products Company, Brunett being resident sales manager for that company, and arrested Brunett for a previous sale and the unlawful possession of intoxicating liquor and for violations of section 30. That the arrest was lawful defendants admit. After the arrest, the officers searched the office and Brunett's desk, and, finding a number of books, documents, and letters, seized and held them. They had a search warrant, secured from a United States commissioner upon the affidavit of one of them, wherein it was set out that he believed whisky, wine, beer, and gin were located in the suite of rooms known as 609 Waltower building, and that his reason for so believing was that he himself had there purchased from A. E. Brunett on January 7, 1931, one quart of wine with an alcoholic content of more than one-half of 1 per centum. The search warrant authorized a search of the premises for, and a seizure of, all whisky, wine, beer, and gin found thereon.

The motion for the return of property and the suppression of evidence sets out as grounds therefor, first, that the affidavit on which the search warrant was procured was false, in that the affiant in fact had not purchased a quart of intoxicating wine from Brunett; second, that the search warrant was illegal, in that it authorized a search in the nighttime, although the supporting affidavit was not "positive that the property" to be seized was "at the place to be searched," as required by section 10 of title 11 of the Espionage Act (18 USCA § 620); and, third,

that the things which were seized were not the things authorized in the search warrant to be seized.

The motion was denied. In passing on the motion, it was considered:

1. It was for the United States commissioner to determine whether there was probable cause for the issuance of a search warrant, and his determination of probable cause, unless arbitrary, was conclusive. Gracie v. United States (C. C. A. 1) 15 F.(2d) 644, 646. If the affidavit was sufficient in its allegations, and in this instance there is no doubt of that, then there was probable cause and the search warrant was valid. The "probable cause" required by the Fourth Amendment is that shown by an affidavit. The commissioner is not required to conduct an investigation for determining whether the affidavit is true, and a subsequent showing of its falsity cannot have the effect of retrospectively invalidating a warrant valid when issued. See Thorpe, Prohibition and Industrial Liquor (1926 Ed.) p. 410, n. 37.

2. The search warrant here did authorize a search either in the day or night, but the defendants cannot complain of that, since it has been clearly shown that the search made was between the hours of 11 a. m. and 3 p. m.

3. The seizure of books, documents, and letters was not authorized by this warrant. The authority in the warrant was to seize whisky, wine, beer, and gin. The Fourth Amendment requires that such a warrant shall "particularly" describe "the things to be seized," and therefore impliedly prohibits a seizure by virtue of a warrant what is not particularly described. United States v. Kirschenblatt (C. C. A. 2) 16 F.(2d) 202, 51 A. L. R. 416.

4. No search warrant was required for the seizure under the circumstances here of the books, documents, and letters which were seized. "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted." Agnello v. United States, 269 U. S. 20, 30, 46 S. Ct. 4, 5, 70 L. Ed. 145, 51 A. L. R. 409. See also Marron v. United States, 275 U. S. 192, 198, 48 S. Ct. 74, 72 L. Ed. 231.

I should say here, however, that my mind is not entirely free from doubt. The defendants have admitted that the arrest was lawful. I am satisfied that it was lawful. But for what offense was Brunett arrested? If he was arrested only for the sale and possession of intoxicating liquor, it is difficult to believe that the things seized were connected with those crimes as their fruits or as the means by which they were committed. The reasonable inference is (the evidence was not positive as to this) that he was arrested also for violations of section 30. An investigation to determine whether this section had been violated had gone on for months. The arrest was the denouement of this investigation. Certainly the things seized were evidence of and were of the means by which violations of section 30 had been effected.

## IV. Arraignment.

On Saturday, October 10, 1931, before the trial, the defendants, being called for arraignment, waived a formal reading of the indictment and entered pleas of not guilty.

## V. Waiver of Trial by Jury.

When the case was called for trial, the parties asked leave to and did file a stipulation in writing waiving trial by jury, signed on behalf of the government by Thomas J. Layson, assistant United States attorney, by the defendant Ukiah Grape Products Company by E. J. Gorman, its president, and by the defendant Albert E. Brunett, per se.

In Patton et al. v. United States, 281 U. S. 276, 312, 50 S. Ct. 253, 263, 74 L. Ed. 854, 70 A. L. R. 263, the Supreme Court affirmed "the power of the defendant in any criminal case to waive a trial by a constitutional jury and submit to trial by a jury of less than twelve persons, or by the court," but it was said that: "The maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity."

Because of this language of the Supreme Court, it is proper to say that the waiver of a jury trial in this case did receive the sanction of the court. While the case is an important one by reason of its novelty and of its possible effect on a certain type of industry, the offenses charged are not grave as gravity in this connection is measured. They are misdemeanors. Chiefly questions of statutory construction and interpretation are involved. The fact issues are relatively unimportant. The case is peculiarly one, therefore, in which, in the exercise of a sound and advised discretion, the court may sanction waiver of trial by jury.

## VI. Summary of the Testimony.

The government called witnesses who testified that each of the sales of the preparation, compound, and substance charged in the indictment to have been made by the defendants were made, in the quantities, on the dates and to the persons alleged. Witnesses were called who testified that the preparation, compound, and substance charged in the sixth and seventh groups of counts to have been possessed for sale by the corporate defendant were seized by the government in the quantities charged, at the places and times alleged, in the possession and custody of an express company, contained in kegs and casks upon each of which was the name and address of a consignee. Their origin and ownership was admitted by the corporate defendant. Concerning these features of the government's case there was no controversy.

The government called certain witnesses, one of whom was a special agent of the Department of Justice, who had been employed by the defendants as salesman in Kansas City territory. By these the government sought to show what instructions were given by Brunett to salesmen, and what they, in turn, were required to represent to prospective purchasers. The purpose of this testimony was to prove the intent and design of the defendants in connection with sales made by them. It was to the effect that the salesmen from time to time were convened and given lectures as to the nature of the product and as to what they should represent to prospects.

They were told that the company was engaged in selling a product which was "not grape juice but an unfermented wine"; that the grape syrup which entered into the product was shipped from California to New York; that it was held then in the defend-

ant company's factory until orders were received; that, when orders were received, it was mixed with a form of sugar, water, and various flavors, and classified under the names of well-known wines, as Port, Muscatel, Burgundy, Claret, Sherry, Madeira, Rhine, etc. They were told that, when an order was received, for example, for Burgundy, a quantity of that brand would be made up and immediately shipped by express for delivery. They were told that the product when received by the purchaser would not yet have developed an alcoholic content, or not more than one-half of 1 per centum of alcohol by volume.

The salesmen were instructed that in seeking purchasers they should not go from house to house, but should pick out from among their acquaintances and upon inquiry business and professional men who were known to like wine and liquor, and were to solicit them for orders. They were to tell prospective purchasers that the product sold to them would, after purchase, come up to the standard of any pre-war wine. They were to tell them what they should do with the product when it had been delivered. The purchaser was to be told that, having received the keg shipped to him, he should place it in a dry, warm room with a temperature of between 70 and 85 degrees; it should be raised a few inches from the floor and kept upright; he should so manipulate the bung that gases might escape; that he should continue the keg in the position and in a place of the temperature indicated for around three weeks, until the liquid had ceased to ferment; then he should siphon the contents from the keg into glass jars for clarification; he should permit the liquid to remain in the glass containers for a further period of from two to three weeks; he might then further clarify the contents of the glass containers by filtering. The finished product would be an excellent, high-grade wine, containing, depending upon the brand which had been purchased, from 12 to 18 per cent. of alcohol by volume.

In addition to this testimony, the government called as witnesses various purchasers of the product who testified they had followed instructions received by them, and that they had drunk the finished wine, and that they had been intoxicated by it.

Another group of witnesses was made up of two physicians, each of whom had made a special study of the physical and mental effects resulting from the use of intoxicating liquors. It was their testimony that any wine or other beverage containing as much as 10 per cent. of alcohol by volume was intoxicating in fact.

A chemist called by the plaintiff testified that he had analyzed the product sold by the defendant company, both before it was delivered and after the directions with which it was sold had been carried out and the finished wine obtained. In general, his testimony corroborated what were said to have been the representations made to salesmen and by them to purchasers.

A letter dated February 4, 1931, signed by the then president of the corporate defendant, was offered in evidence. In it was the following:

"All products are shipped the same day they are blended and kegged. * * * Every effort is made to produce and ship these products in such a manner that they can not ferment for at least several days after they are received by the purchasers. * * *

"These unfermented non-alcoholic products are sold in kegs, mostly five and ten gallon sizes, to the consumer for home use only. * * * Salesmen are instructed to tell their customers that if these products are kept in a warm place for two months or more, allowed to clear, are siphoned into glass containers one or more times, etc., that such products will develop into a fruit juice commonly described as wine, with an alcoholic content of from 10 to 15%.

"It is our opinion, based upon reasonable evidence, that we have been of untold aid to the enforcement of the law, by making the bootleggers' business unprofitable, and by enabling the American public to purchase a pure, wholesome product legally, at low prices, instead of buying unwholesome, impure products illegally from liquor peddlers at exorbitant prices."

The government also introduced in evidence a small memorandum book which was seized in the defendant company's office, in which, in Brunett's handwriting, were outlines of the instructions he had been directed by his superiors in the New York office to give to salesmen employed by him. The instructions outlined in this book were identical with those which the salesmen themselves testified they had been given.

Excerpts from this memorandum book are these:

"Carrying one ounce of sample one cannot be arrested as it takes two ounces to make alcoholic content. * * *

"Keep keg in 70 to 90 degrees—pull out bung—cut band. Let stay for three weeks, preferably four. Siphon out into glass containers after three weeks. Siphon carefully into quart bottles. * * *

"We have sweet wines, semi-sweet and dry and astringent wines. They have a percentage of alcohol running between 14 and 18%. * * * Upon arrival at a customer's home they are not alcoholic but by simply removing bung which is situated on top of the barrel and letting it stand for three weeks, then siphon it out into one gallon jars, and three weeks more the customer has a beautiful and delicious wine. . Thus in six weeks' time it is the same wine he had and used to drink before prohibition. * * * "

In this memorandum book is found the following suggested introduction· for a sales approach: "My name is so-and-so. Some people around here call me King Bootlegger because of the numerous times I have called on numerous friends of yours, and you have been recommended to me by so-and-so. Mr. So-and-so who sent me here * * * will tell you it is the most marvelous stuff in the world."

Another suggested sales talk taken from this memorandum book: "Good morning, Mr. Jones. I am around here quite a bit·and I have been calling on some of your friends and they suggested that I call on you as you are a two fisted * * * sport. Would you be interested in a good class of pure, unadulterated crystal clear, wholesome wine, with a % of alcohol of from 14 to 18?"

· In this memorandum book are the most minute directions as to the· arrangements of the company's office. Thus there is an entry to the effect that "the office girl must be pretty, but not fat, of good, family, a Protestant and a prohibitionist."

Another entry suggests a question to be asked an applicant for the position of salesman, as follows: "Do you like wine? The reason I ask this is because it is our business to sell and make wine. We operate in strict compliance with federal and state laws."

The testimony offered by the defendants included that of the defendant Brunett and of the president of the defendant company. There were flat denials by them that sales ever were made except to home owners and for use in homes; that the product sold ever was represented as wine. It was represented rather as a fruit juice. There were denials that the salesmen were instructed to solicit persons who liked wine and liquor. There were denials that purchasers were instructed · to keep the product in a place with a temperature of between 70 and 85 per cent. Rather they were to be instructed to keep the product in a place where there was a living temperature. In these respects they were corroborated by various salesmen. Salesmen were never to service the product after it reached the homes of the purchasers. The defendants were engaged only in selling a nonintoxicating grape juice concentrate, to which a form of sugar had been added, together with water and flavoring extracts. The resulting compound was absolutely without any alcohol content when it was delivered to purchasers. It was sold only to home owners for exclusive use in homes. There was really nothing for the purchaser to do with the product except to let it stand in a dry place. The trifling things the purchaser was instructed to do, as releasing a rubber band from the bung, setting the keg in an upright position, siphoning the product after a period of weeks, were solely to secure a clarification of the product, and in no sense to promote or bring about its fermentation. Fermentation would result and an alcoholic content of from 10 to 18 per cent. finally would be reached, but that was solely through the operation of natural laws.

The president of the company testified by deposition. He was asked the direct question by counsel for defendants: "Q. What were your instructions to customers relative to· the treatment of this product? A. To simply stand the cask in an upright position in the home, the dry part of their home, and do nothing to it whatever for a period of sixty days, at the end of which time it should be clear, and if they so desire they can then bottle it and use it, but they must, however, pasteurize it in order to prevent it from obtaining an illegal alcoholic content."

There was no other testimony on the part of any witness, either for the government or the defendants, that customers were instructed to pasteurize the product when received by them so as to prevent fermentation and the development of alcohol. .

The defendants offered the testimony of a chemist who corroborated their other testimony that there was no alcoholic content in the product sold at the time it was shipped by express from New York, and who testified that an alcoholic content of as much as one-half of 1 per cent. would not in the natural course develop in the product in less than seven days.

Medical witnesses testified for the defendants that even after its development into its finished form the product was not intoxicating in fact; that for the reason that its sugar content was so great a drinker would not be able without nauseation to take into his stomach a sufficient quantity to produce intoxication.

It was developed in the testimony of defendants' witnesses that the product was sold at various retail prices varying from around $3 a gallon to as much as $5 a gallon, and that the salesmen received a commission of 25 per cent.

This summary is not intended to include all the details of the testimony, but to set out from the respective viewpoints of the parties its essentials so far as they appear to be relevant to the issues.

It may be said that the conflicts in the testimony were in these respects: First, as to what remained to be done by the purchaser after the product was received by him; second, as to what directions were given to the purchaser concerning the processing of the product; third, as to whether the resulting beverage in its finished form was intoxicating in fact.

## VII. Section 30, Title 27—Construction of the Section.

The indictment, as I have said, charges violations of section 30, title 27, U. S. C. (27 USCA § 30). There is controversy between the parties as to the meaning of certain of the provisions of that section, and, of course, that meaning must be ascertained before the law established by the section can be applied.

Again setting out the section, it is: "It shall be unlawful to advertise, manufacture, sell, or possess for sale any utensil, contrivance, machine, preparation, compound, tablet, substance, formula, direction, or recipe advertised, designed, or intended for use in the unlawful manufacture of intoxicating liquor."

Separating the several elements of the offense described, we have: It shall be unlawful (1) to sell (2) any preparation, compound, substance (3) designed or intended (4) for use in manufacture (5) of intoxicating liquor (6) (if the manufacture in which it is designed or intended to be used) is unlawful.

It would indeed be difficult to find in our language simpler, more easily understood words, words whose meanings have been longer constant, than the words used in this section. It is a cardinal principle of statutory construction declared in a myriad of decisions that "words in common use are to be construed in their natural, plain, and ordinary signification." 36 Cyc. 1114. "Words are the common signs that mankind make use of to declare their intention to one another; and, when the words of a man express his meaning plainly, distinctly, and perfectly, we have no occasion to have recourse to any other means of interpretation." Lake County v. Rollins, 132 U. S. 662, 671, 9 S. Ct. 651, 653, 32 L. Ed. 1060.

It would seem that in section 30 the only words whose intended meaning may be something other than "their natural, plain and ordinary signification" are the words "intoxicating liquor." The statute of which section 30 is a part expressly gives to them a special signification.

1. There is no controversy as to the meaning of the words "to sell."

2. As to the words "preparation, compound, substance," the defendants contend, not with any marked degree of earnestness, that in the use of them Congress intended something less than "their natural, plain and ordinary signification."

As ordinarily understood, a "preparation" is "that which is prepared; something made; equipped or compounded for a particular purpose." Webster's New International Dictionary. And a "compound" is, "that which is compounded or formed by the union or mixture of elements, ingredients or parts." Webster's New International Dictionary. A "substance" is "body; matter; material of which a thing is made." Webster's New International Dictionary.

A fair statement of the defendants' argument in this connection is (I quote from defendants' brief) that the "section was clearly primarily intended to cover utensils, equipment, manufactured contrivances, and machines and also to include formulae, recipes, tablets, etc. that were designed for use in the manufacture of intoxicating liquor as the term 'intoxicating liquor' is defined in the earlier sections of the act. * * * It was not intended to embrace a product (included in the provisions of section 46) * * * It was not intended to have both sections cover a product of the kind herein involved."

Hereinafter fuller reference will be made to section 46. It is sufficient now to say that it saves from the penalties of the National Prohibition Act one who manufactures "non-

intoxicating cider and fruit juices exclusively for use in his home."

The argument of defendants seems to me to have no merit.

In the first place, the words "preparation, compound, substance" are in the section. They were not intended to be meaningless nor to have a meaning identical with other words associated with them and clearly differentiated in their signification.

In the second place, it appears in the legislative history of section 30 that as first introduced in Congress it referred only to "preparations, compounds and substances," and that the companion words which defendants say were what Congress primarily had in mind were added by amendment. H. R. Conference Report, No. 360, Oct. 7, 1919, p. 15. It was the companion words which were the afterthought of Congress and not those with which here we are particularly concerned.

In the third place, in making the contention that the words "preparation, compound, substance" were not intended to include any kind of a preparation, compound, or substance of which fruit juice might be a constituent element because, under certain circumstances and by certain persons, nonintoxicating fruit juices may be manufactured, defendants not only get the cart before the horse, but urge an obvious non sequitur.

Section 46 exempts certain persons from the penalties of the law. It assumes, therefore, that the law, including section 30, imposes the penalties from which there should be an exemption. It does not retrospectively modify the earlier definitions of offenses in any of their elements. And it does not follow that, because nonintoxicating fruit juice may be manufactured by one for use exclusively in his home, that something wholly different, to wit, a preparation, compound, and substance in which fruit juice may be an element, was not within the intention of Congress in section 30.

■■ ■ 3. While the words "designed" and "intended" by which the third element of the offense is stated are simple words, some ambiguity as to their significance arises from their position in the section. It is unlawful to sell "any * * * preparation, compound * * * substance * * * designed or intended for use in the unlawful manufacture," etc. From this arrangement it might be thought that the words "designed" and "intended" described the preparation, compound, and substance prohibited

to be sold and referred to some inherent quality therein. Again, it might be thought that they referred to the design and intention of the purchaser. The third possible interpretation is that they refer to the vendor's design or intention.

My view is that the words "designed" and "intended" must be construed to include a design and intention on the vendor's part that the preparation, compound, and substance sold by him will be used in the unlawful manufacture of intoxicating liquor. Such a construction is the one most favorable to one accused. It has never been the policy of the law to make an act innocent in itself criminal if the actor had no wrongful purpose or intent. It is scarcely to be thought that Congress purposed to make the mere sale of a preparation, compound, or substance a crime unless the seller had also an intention and design that what was sold by him should be used in the commission of a crime. Certainly Congress did not intend that he should be guilty of an offense because the manufacturer, if he were other than the vendor, designed the preparation, compound, and substance for an ultimate unlawful use, or because the purchaser so intended to employ it.

Such of the decided cases as have construed the words "designed" and "intended," as they are used in section 30, have construed them as referring to the design and intent of the vendor.

Thus in Weinstein v. United States, 293 F. 388, 389, the Circuit Court of Appeals for the First Circuit said: "We think the intention referred to in the statute * * * is that of the seller alone. It is his act which is made lawful or, unlawful, depending upon his intention in regard to the use to be made of the article sold, provided the article is designed to carry out that purpose."

And in Nosowitz et al. v. United States, 282 F. 575, 578, the Court of Appeals for the Second Circuit said, speaking of these words: "It has always been the law (unless otherwise prescribed by statute) that to convict one of crime requires the proof of an intention to commit a crime. * * * The act of manufacturing [in this case manufacture rather than sale was charged] must have coupled with it a specific intent to do the wrong denounced in the statute before the defendants may be said to be guilty."

In Hammerle v. United States, 6 F. (2d) 144, it was held by the Circuit Court of Appeals for the Sixth Circuit that proof of un-

lawful intent upon the part of the vendor was essential to a conviction under section 30.

I have said it is my view that the words "designed" and "intended" include a design or an intent on the part of the vendor. I think that they include also something more than that (and a construction which gives them an even larger meaning also is favorable to one accused of a violation of the section). I think the words refer, not only to the design and intention of the vendor, but as well to the inherent qualities of the preparation, compound, and substance sold. The preparation, compound, and substance must be within itself peculiarly designed for the unlawful use referred to in the section. Otherwise we might have criminal cases in which nothing more was sold than a box of matches or a gallon of gasoline. For certainly matches and gasoline are substances, and certainly, also, they not only may be used, but necessarily are used, in the unlawful manufacture of such intoxicating liquors, as, for example, distilled spirits. So, as I think, it was rightly said by the Court of Appeals for the First Circuit in Weinstein v. United States, supra, that an essential of the offense charged, in addition to the intention of the vendor, is that "the article is designed to carry out that purpose."

 4. The preparation, compound, and substance sold must be designed or intended for use in the manufacture of intoxicating liquor. What is meant by the word "manufacture" as here used?

This word also, like all others in this section, is a simple, frequently used word, whose meaning is universally understood. Etymologically it is derived from the Latin words "manu" (by the hand) and "facio" (to make). It is defined in Webster's New International Dictionary as: "The process or operation of making wares or any material products by hand, by machinery, or by other agency; anything made from raw materials by the hand, by machinery, or by art."

In this case we are concerned with a certain particular type of intoxicants; that is, wines and vinous liquors.

That wines and vinous liquors are manufactured products, and that therefore manufacture is involved in their production, are such elementary truths that to argue them would be puerile. Manufacture of wine is among the ancient arts. The processes involved are relatively few and simple. Grapes are picked; their juice is expressed by the hands or feet of men, with or without the aid of mechanical appliances; the expressed juice is confined in containers; fermentation, a chemical change which nature brings about, is then permitted. The process of fermentation may or may not be hastened or controlled by various methods taught by long experience. The fermented product may be clarified mechanically or by the settling of the sediment by operation of the natural law of gravity. Finally, the product is drawn off and confined in casks or bottles for use. Thus wine is manufactured.

Whatever is done, from the picking of the grapes to the bottling of the wine, to bring the product into its finished state, is a part of the manufacture. Who does any one of the several acts in the succession of acts necessary to the bringing into existence of the finished product, if he does it with the production of wine in view, is engaged in the manufacture.

One who picks grapes from the vine, of course, is not engaged in the manufacture of wine if he picks the grapes as an act independent of and unrelated to other acts necessary to the making of wine. That is true also of one who, independently and without reference to other acts, expresses the juice from grapes. So as to each of the acts essential to the final result, if it is independently done and without reference to the work of others. But, if all the acts are related and connected with a common end in view, and that end the making of wine, then each of the actors is engaged in the manufacture of wine.

To say that wine is not manufactured unless every process essential to the final result is done by the hand of one man is an absurdity. To say that A, B, C, and D, employees of X, a wine manufacturer, are each engaged in wine manufacturing if A picks the grapes and brings them to the press, and B presses out the juice, and C confines it in casks for fermentation and manipulates the casks to hasten fermentation, and D bottles the finished product, but that no one of them is engaged in manufacturing wine if they are not employed by and in their several parts acting at the behest of X, is to make the nature of a continuing process and of its several parts dependent, not upon anything that concerns the process, but upon something that concerns only the economic relations of the participants.

The decisions are numerous which hold that one who contributes some essential service to the creation of wine is engaged in the manufacture of wine.

It was said, for example, by the Supreme Court of Oregon in State v. Marastoni, 85 Or. 37, 165 P. 1177, 1178: "It is claimed that because the defendant did no affirmative act to produce fermentation, but simply put the grape juice into a vat and 'let nature take its course,' he did not manufacture the wine; but this contention is unsound. Under such a construction no wine ever has been or ever will be made by human agency. * * * The well-known action of the air and the germs therefrom which produce fermentation were utilized and intended to be utilized in the process of manufacture. Some of the most important compounds known to commerce and medicine are manufactured by bringing two or more substances in contact and allowing the chemical forces of nature to produce a new compound or substance."

The word "manufacture" is used, not only in section 30, but also in section 39, and in a similar connection in each section. In section 39 it is declared to be unlawful "to have or possess any * * * property designed for the manufacture of liquor intended for use in violating this chapter. * * *"

The word "manufacture" as used in section 39 was construed by the Supreme Court of the United States in Danovitz v. United States, 281 U. S. 389, 50 S. Ct. 344, 345, 74 L. Ed. 923. In that case the government had seized and was asking the forfeiture of certain empty containers, such as barrels and bottles, upon the theory that they constituted "property designed for the manufacture of liquor." This seizure and proposed forfeiture required a construction of the word "manufacture" which the owners of the property contended was erroneous, for that the containers were to be used only after the manufacture of liquor was complete. Their strict construction of the word "manufacture" the court rejected. As to the proper construction it was said: "The argument for the petitioner cannot be helped by amplification. It is obviously correct if the word 'manufacture' be taken in the strictest and most exact sense. But the word may be used in a looser way to express the whole process by which an article is made ready for sale on the open market. * * * As the purpose of the Prohibition Act was to 'suppress the entire traffic' condemned by the act, * * * it should be liberally construed to the end of this suppression, and so directs. * * * The decisions under the revenue acts have little weight as against legislation under the afflatus of the Eighteenth Amend-

ment. We are of opinion that the word was used in this looser way, and that if the empty containers and the other objects seized were offered for sale in such a mode as purposely to attract purchasers who wanted them for the unlawful manufacture, as we interpret the word, they were designed for that manufacture and could be seized."

It should be clear that if, as was held in the Danovitz Case, the word "manufacture" as used in the National Prohibition Act is to be given such a liberal construction as that it will include the bottling of intoxicating liquor after its manufacture, as the word is generally understood, has been completed, then certainly it includes any process intermediate between the first and the last steps taken in manufacture, if that process is essential or contributes to the completion of the manufacture.

I think there can be no doubt that one who takes an unfermented liquid, capable of fermentation, which when it has been fermented will be wine, and who so places it as that it may be kept dry and fermentation thereby aided, who sees to it that the temperature is the one most favorable to fermentation and maintains that temperature, who controls the admission of air to the fermenting liquid and excludes foreign matter from it, who clarifies the product in the course of its fermentation, and who finally bottles the beverage in permanent containers, is engaged in the manufacture of wine within the meaning of the word "manufacture" as it is used in section 30.

5. The words "intoxicating liquor" as they are used in section 30 need no interpretation. They are construed by the act itself in section 4, wherein it is declared that as used in the National Prohibition Act, of which section 30 is a part, the words "'intoxicating liquor' shall be construed to include * * * wine, and * * * any * * * vinous * * * or fermented liquor * * * containing one-half of 1 per centum or more of alcohol by volume which are fit for use for beverage purposes."

6. The sixth and last element of the offense prohibited in section 30 is that the manufacture in which it is designed and intended that the preparation, compound, and substance shall be used shall be an "unlawful manufacture." Obviously, what is meant here is any manufacture which is unlawful under the National Prohibition Act, and that includes by the very terms of the act any manufacture of wine or vinous liquor containing more than one-half of 1 per cent. of

alcohol by volume. It does not include, because that is not unlawful, the manufacture by a person of nonintoxicating cider and fruit juices exclusively for use in his home.

VIII. Section 46, Title 27—Construction of the Section.

 The defendants rely largely on section 46, especially on that part which exempts from the penalties of the National Prohibition Act certain persons under certain circumstances.

Section 46, after setting out what penalties shall be imposed for violations of the act, continues with the following: "The penalties provided in this chapter against the manufacture of liquor without a permit shall not apply to a person for manufacturing nonintoxicating cider and fruit juices exclusively for use in his home."

The construction of this section is made necessary by the contentions of the defendants as to its interpretation.

The penalties of the National Prohibition Act are not to apply (1) to a person manufacturing (2) nonintoxicating cider and fruit juices (3) exclusively for use in his home.

The words used here, like those in section 30, are common words of meanings well understood, and which, it would seem, are not necessary to be construed.

The exemption from the penalties of the National Prohibition Act granted by this section is to the manufacturer of cider and fruit juices.

"Cider" is the "expressed juice of apples." Webster's New International Dictionary.

1. The word, "fruit," whatever else it may include, certainly includes grapes, and the words "fruit juices" certainly include the juice of grapes or grape juice. Cider and grape juice certainly are the products of manufacture. They are manufactured by expressing from apples and grapes, respectively, their juices. There is no other conceivable way in which either cider or grape juice can be manufactured.

To say that the term "grape juice" can include a liquid which is composed of a half dozen constituents, the juice of grapes, and that evaporated, the body of grapes, including the seeds of grapes, a large proportion of sugar, a large quantity of water, and various other ingredients, is to be guilty of such a distortion and expansion of the meaning of simple words as seems unthinkable. To go still further, to maintain that one who takes such a concoction of ingredients, and from it, by permitting and promoting its fermentation, produces a beverage with a high alcoholic content—to maintain that he has manufactured grape juice is to suggest what to me seems the very extremity of the ridiculous.

Is it possible that the same grape juice can be manufactured not only twice, but thrice? It is manufactured when it is expressed from the grapes. Is it again manufactured when it is mixed with water, sugar, and other ingredients? Is it manufactured a third time when the product of the second manufacture is fermented and becomes wine? And is there perhaps a fourth manufacture of the same grape juice when, by the processes of nature applied by the hand of man to wine, the wine develops into vinegar?

There is a paucity of judicial opinions dealing with this precise question, a fact which probably may be accounted for by the obvious unreasonableness of a suggestion that grape juice can be anything other than the juice pressed from grapes.

There is one opinion and decision directly in point. While it is that of an intermediate state appellate court in California (the Appellate Department, Superior Court, Los Angeles county, Cal.), nevertheless that court's reasoning is convincing. The case is People v. Sinicrope (People v. Stoddard), 288 P. 61, 63. The section of the California statute there construed is identical with section 46. The court said:

"By way of an endeavor to bring himself within the shelter of title 2, section 29, the defendant proved that the liquor he was charged with possessing was made by the process of adding water to a thick jelly-like syrup obtained in the market, the syrup being concentrated grape juice.

"We are of the opinion that the attempted defense fails. The defendant cannot say the liquor he possessed was fruit juice which he manufactured. If he has manufactured any product, he has done so by operating on a product manufactured by some one else. The raw article, fruit, from which fruit juices may be manufactured, was never in his hands. If any fruit juice was manufactured, it was done, not by him, but by those who make the grape juice which in turn was concentrated to make the syrup bought by the defendant in the market. We are convinced that the exception here made to the general rule that no person shall manufacture or pos-

sess liquor containing more than one-half of 1 per cent. of alcohol by volume is limited to those who themselves take the steps whereby cider or fruit juice is obtained from the fruit, and does not include those who make use of fruit juice preparations manufactured by some one else."

On rehearing, the court enlarged upon the reasoning contained in the quoted excerpt. In the margin is set out part of the opinion then rendered.[1]

 2. The word "nonintoxicating" as it is used in section 46 has indeed received two constructions by the courts. Some courts have held that by that word is meant that which does not contain more than one-half of 1 per cent. of alcohol by volume. United States v. Picalas (D. C.) 27 F.(2d) 366; In re Baldi (D. C.) 33 F.(2d) 973. Other courts have held that by the word "nonintoxicating" as used in this section is meant that which is not intoxicating in fact. Isner

v. United States (C. C. A. 4) 8 F.(2d) 487; Picalas v. United States (C. C. A. 4) 33 F. (2d) 1022. The last of these constructions is probably the right one.

 The statutory definition is not of the word "nonintoxicating" but of the words "intoxicating liquor." The term "intoxicating liquor" is not used in section 46. We do not then have a case in which the same term is used in different parts of the same statute, and therefore we do not have a case in which the rule of statutory construction applies—that the same term used in different parts of the same statute should be given the same interpretation. If the word "nonintoxicating" as used in section 46 is given the first of the suggested meanings, then this part of section 46 is made meaningless, for no penalties are prescribed by the law against the manufacture of cider or fruit juices which do not contain more than one-half of 1 per cent. of alcohol by volume.

3. My conclusion as to the construction of section 46 is that it exempts from the penalties of the National Prohibition Act only him who manufactures cider and fruit juices by expressing the juices from the respective fruits for use exclusively in his home, and him only as to such cider and fruit juices as he does not intentionally and actively permit to become intoxicating in fact.

## IX. Declarations of Law.

 1. I declare the law to be that the indictment constitutes no proof of the guilt of the defendants, or either of them, and is not to be considered as any evidence whatever in the case. It is a mere formal charge.

 2. I declare the law to be that the defendants, and each of them, are presumed to be innocent, and that the benefit of that presumption attends them throughout their trial.

 3. I declare the law to be that the burden of proof is upon the plaintiff to prove the defendants guilty beyond a reasonable doubt. By the term "reasonable doubt" is meant a doubt which is reasonable, a doubt of such a quality as that, were a doubt of like quality to arise in the private life of an individual in connection with some important decision required to be made by him, he would hesitate and pause in that decision. If when all the facts in evidence have been considered by the trier of the issues of fact he is abidingly convinced to a moral certainty that the defendant is guilty, then he does not have a reasonable doubt. If there is a reasonable doubt as to the guilt of either

[1] "It is declared in the brief that 'to be a manufacturer of grape juice * * * one * * * may use * * * grape juice which has been prepared by another,' but no explanation is given of how this may be accomplished. We think the same grape juice can be manufactured but once, and any further processes to which it may be subjected, although they be of a manufacturing nature, cannot constitute the manufacture of grape juice. A reference to the definition of the word 'juice' is helpful to an understanding of the statute. That word is defined as follows: 'The extractable fluid contents of plant cells or plant structures consisting of water holding sugar or other substances in solution.' Webster's Dictionary. 'The fluid part of animal or vegetable matter; especially the expressible watery matter in fruits, containing usually the characteristic flavor.' Standard Dictionary. 'The juice of vegetables or fruit is nothing but the sap obtained by expression. If the sap is subjected to heat and evaporation, the article thus produced is generally understood to be a different thing from the sap.' Per Taft, J., in Smith v. Rheinstrom (C. C. A. 6, 1895) 65 F. 984, 985. It follows from these definitions, and is in effect held in the case just cited, that the syrup or 'concentrated grape juice' which defendant testified he bought and used in his operations was not grape juice. Undoubtedly it had at one time been grape juice, before it passed through the manufacturing process by which it was reduced to the 'thick jellylike syrup' which defendant described, but it does not follow that it again became grape juice by the addition of water, and we cannot hold that it did, for two reasons. In the first place, the defendant, on whom was the burden of proof, made no showing that the fluid resulting from the addition of water to this syrup was the same either chemically or physically as the original grape juice; and we very much doubt if it was, in view of the results obtained in other processes of concentration and dilution, instances of which are canned or dried milk. In the second place, if it were possible by any sort of synthetic process to make a fluid identical with the juice extracted from grapes, it would not be grape juice by any of the foregoing definitions. It is an essential part of all of them that the fluid to be termed 'juice' shall have been extracted or pressed from the fruit. This is not true of the fluid produced by the defendant. Some part of it had been so extracted, but not the added water which constituted four-fifths of its bulk."

of the defendants as to any one of the several counts in the indictment, then as to that defendant and as to that count he is entitled to an acquittal.

4. I declare the law to be as to the defendant Albert E. Brunett, and as to count 1 of the indictment, that, if it has been proved beyond a reasonable doubt that on or about the 20th day of October, 1930, he did sell to one Roy O. Shively a preparation, compound, and substance, to wit, about 10 gallons of a specially prepared concentrate previously manufactured from grape juices and capable of producing wine, and that he, the said Albert E. Brunett, did at the time of so selling said concentrate design and intend that it should be used by the said Roy O. Shively in the unlawful manufacture of wine for beverage purposes, and that the said specially prepared concentrate was inherently designed for and capable of producing wine, and that the said Roy O. Shively did not then have a permit authorizing him to manufacture wine, and if all of these facts have been proved beyond a reasonable doubt, then the defendant Albert E. Brunett is guilty as charged in the first count of the indictment. And I further declare the law to be that, if any one of the several facts hereinbefore set out as an essential of the offense charged has not been proved beyond a reasonable doubt, then the defendant Albert E. Brunett is not guilty as charged in the first count of the indictment. And I further declare the law to be that what is herein declared as elements of the offense, proof of all of which beyond a reasonable doubt will establish the guilt of the defendant Albert E. Brunett, is subject to the qualifications hereinafter declared in declaration of law No. 15.

5. I declare the law to be as to count II of the indictment and as to the defendant Albert E. Brunett that, if it has been proved beyond a reasonable doubt that on or about the 20th day of October, 1930, in Kansas City, Jackson county, Mo., the defendant Albert E. Brunett did sell to one Roy O. Shively a preparation, compound, and substance, to wit, about 10 gallons of a specially prepared concentrate, and that he, the said Albert E. Brunett, in selling said concentrate, designed and intended that it should be used by the said Roy O. Shively in the manufacture of a vinous liquor, intoxicating in fact, and fit for beverage purposes, and that the said specially prepared concentrate was inherently designed for and capable of producing a vinous liquor intoxicating in fact, and that the said Roy O. Shively did

not have a permit authorizing him to manufacture intoxicating liquor, and if all and each of said facts have been proved beyond a reasonable doubt, then the defendant Albert E. Brunett is guilty as charged in the second count of the indictment. I further declare the law to be that, if any one of the elements of this offense hereinbefore declared as essential to the guilt of the defendant under count II of the indictment has not been proved beyond a reasonable doubt, then the defendant Albert E. Brunett is not guilty. And I further declare the law to be that what is herein said as constituting proof of the guilt of the defendant Albert E. Brunett is subject to the qualifications hereinafter set out in declaration of law No. 15.

6. I declare the law to be as to count III of the indictment and as to the defendant Albert E. Brunett that, if it has been proved beyond a reasonable doubt that on or about the 20th day of October, 1930, in Kansas City, Mo., he did sell a preparation, compound, and substance, to wit, about 10 gallons of a specially prepared concentrate to one Roy O. Shively, and that he, the said Albert E. Brunett, at the time of the said sale, did design and intend that the said specially prepared concentrate should be used by the said Roy O. Shively in the manufacture of a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume and fit for use for beverage purposes, and that the said specially prepared concentrate was inherently capable and designed for the manufacture of a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume, and that the said Roy O. Shively did not then have a permit authorizing him to manufacture intoxicating liquor, and if all and each of these facts have been proved beyond a reasonable doubt, then the defendant Albert E. Brunett is guilty as charged in the third count of the indictment. I further declare the law to be that, if any one of the several elements of the offense as hereinbefore set out has not been proved beyond a reasonable doubt, then the said Albert E. Brunett is not guilty. And I further declare the law to be that what is herein said as to the guilt of the defendant, if the several elements of the offense herein stated have been proved beyond a reasonable doubt, is subject to the qualifications hereinafter set out in declaration of law No. 15.

7. As to counts V, IX, XIII, and XVII, and as to the defendant Albert E. Brunett, I declare the law to be as hereinbefore set out in declaration of law No. 4, excepting that in

236

each of said counts a different and distinct sale on a different date and to a different individual is charged to have been made and must have been proved by the plaintiff beyond a reasonable doubt.

8. As to counts VI, X, XIV and XVIII, and as to the defendant Albert E. Brunett, I declare the law to be as hereinbefore set out in declaration of law No. 5, excepting that in each of said counts a different and distinct sale on a different date and to a different individual is charged to have been made and must have been proved by the plaintiff beyond a reasonable doubt. .

9. As to counts VII, XI, XV, and XIX, and as to the defendant Albert E. Brunett, I declare the law to be as hereinbefore set out in declaration of law No. 6, excepting that in each of said counts a different and distinct sale on a different date and to a different individual is charged to have been made and must have been proved by the plaintiff beyond a reasonable doubt.

10. As to counts I, II, III, V, VI, VII, IX, X, XI, XIII, XIV, XV, XVII, XVIII, and XIX, and as to the defendant Ukiah Grape Products Company, Inc., I declare the law to be as hereinbefore it has been declared to be with respect to the defendant Albert E. Brunett in connection with each of said counts, with the further declaration that the plaintiff must have proved that in each of the alleged sales the defendant Albert E. Brunett was acting for and on behalf of the defendant Ukiah Grape Products Company as its agent and within the scope of his authority as such agent.

11. I declare the law to be as to count XXI of the indictment, and as to the defendant Ukiah Grape Products Company, that, if it has been proved beyond a reasonable doubt that on or about January 19, 1931, at the railway express agency located at the union station in Kansas City, Jackson county, Mo., it had in its possession, and then and there possessed for sale, a preparation, compound, and substance of about 150 gallons of specially prepared concentrate which was inherently capable of and designed for producing wine, and which it then and there designed and intended should be used by purchasers thereof, who did not have permits authorizing them to manufacture wine, in the manufacture of wine, and if all of these facts and each of them have been proved beyond a reasonable doubt, then the Ukiah Grape Products Company is guilty as charged in count XXI of the indictment. I further declare the law to be that if any one of the elements of the offense charged as herein set out has not been proved beyond a reasonable doubt that then the defendant, Ukiah Grape Products Company is not guilty. And I further declare the law to be that what are herein declared as elements of the offense charged in this count, proof of all of which beyond a reasonable doubt will establish the guilt of the defendant Ukiah Grape Products Company, is subject to the qualification hereinafter declared in declaration of law No. 15.

12. I declare the law to be that as to count XXII of the indictment, and as to the defendant Ukiah Grape Products Company, that, if it has been proved beyond a reasonable doubt that on or about January 19, 1931, at the railway express agency located at the union station in Kansas City, Jackson county, Mo., the defendant Ukiah Grape Products Company then and there possessed for sale a preparation, compound, and substance, to wit, about 150 gallons of specially prepared concentrate which was inherently capable and designed for producing a vinous liquor, intoxicating in fact, and fit for use for beverage purposes, and which the defendant Ukiah Grape Products Company then and there designed and intended should be used by the purchasers thereof who did not have permits for the manufacture of intoxicating liquor in the manufacture of a vinous liquor, intoxicating in fact, and fit for use for beverage purposes, and if all of these facts, and each of them, has been proved beyond a reasonable doubt, then the defendant Ukiah Grape Products Company is guilty as charged in count XXII of the indictment. I further declare the law to be that, if as to any one of the facts hereinbefore set out it has not been proved beyond a reasonable doubt, then the defendant Ukiah Grape Products Company is not guilty. And I further declare the law to be that what are herein declared as elements of the offense, proof of all of which beyond a reasonable doubt will establish the guilt of the defendant Ukiah Grape Products Company, is subject to the qualification hereinafter declared in declaration of law No. 15.

13. I declare the law to be as to count XXIII of the indictment, and as to the defendant Ukiah Grape Products Company, that, if it has been proved beyond a reasonable doubt that on or about January 19, 1931, at the railway express agency located at the union station in Kansas City, Jackson county, Mo., the defendant Ukiah Grape Products Company then and there possessed for sale

a preparation, compound, and substance, to wit, about 150 gallons of specially prepared concentrate inherently capable of and designed for producing a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume, and fit for use for beverage purposes, and if the defendant Ukiah Grape Products Company then and there designed and intended that the said preparation, compound, and substance would be used by the purchasers thereof who did not have permits therefor in the manufacture of a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume and fit for beverage purposes, and that all of these facts and each of them has been proved beyond a reasonable doubt, then the defendant Ukiah Grape Products Company is guilty as charged in count XXIII. I further declare the law to be that, if the plaintiff has not proved any one of the elements of the offense herein set out beyond a reasonable doubt, then the defendant Ukiah Grape Products Company is not guilty. And I further declare the law to be that what are herein declared as elements of the offense, proof of all of which beyond a reasonable doubt will establish the guilt of the defendant Ukiah Grape Products Company, is subject to the qualification hereinafter declared in declaration of law No. 15.

14. As to counts XXVI, XXVII and XXVIII, and as to the defendant Ukiah Grape Products Company, I declare the law to be as hereinbefore declared, in connection with counts XXI, XXII, and XXIII, respectively, with this change only, that counts XXVI, XXVII and XXVIII refer to an alleged possession for sale of a different quantity and on a different date of the alleged preparation, compound, and substance.

15. As to all of the counts of the indictment, and as to each of the defendants, I declare the law to be that, if the preparation, compound, and substance alleged to have been sold in the counts charging sales, and alleged to have been possessed for sale in the counts charging possession for sale, was or would be, after it had come or would come. into the possession of the purchasers and had reached the finished state which the defendants designed and intended that it should reach for consumption and use by the purchasers, a fruit juice nonintoxicating in fact, which in its finished state had been manufactured by the purchasers thereof for use exclusively in their homes, then the defendants are not guilty as to any of the counts in the indictment, and in this connection I further

declare the law to be that the burden of proof is on the plaintiff to prove beyond a reasonable doubt that the preparation, compound, and substance in its finished state was not a fruit juice, or that, if it was a fruit juice, it was not a fruit juice manufactured by persons for use exclusively in their homes, or that, if it was a fruit juice which was manufactured by persons exclusively for use in their homes, it was intoxicating in fact.

The defendants, and each of them, are allowed an exception to each of the foregoing declarations of law.

## X. Findings of Facts.

I make the following findings of facts, and in making them I do not take into consideration any part of any of the exhibits offered in evidence by the government which were seized at the time of the arrest of the defendant Brunett, and suppression of which defendants asked by their motion or petition. While it is my opinion they were lawfully seized and were competent evidence, their value, even if considered, is purely cumulative, and I have wholly disregarded them in deciding the issues of fact involved in the case. It may be considered that in passing upon the issues of fact I do so after first excluding each and every one of these exhibits to the same extent as if a motion to strike them from the record had been sustained.

1. I find, as stipulated by the parties, that the defendant Ukiah Grape Products Company is a corporation, organized under the laws of the state of New Jersey, with its principal office and place of business in the City of New York, New York state, and that it was at all of the times mentioned in the indictment engaged in the business of selling an extract of grapes and grape products; that the defendant Albert F. Brunett was at the times mentioned in the indictment in the employ of the corporate defendant as its manager in charge of its office in Kansas City, Mo.; that the various sales alleged to have been made in the several counts of the indictment were made by salesmen employed by the defendant Albert E. Brunett for the purpose of soliciting orders for the products sold by the corporate defendant; that with respect to the two alleged quantities of the product sold by the corporate defendant and described in the indictment in counts XXI to XXVIII, inclusive, that the Railway Express Agency at the Union Station in Kansas City, Mo., had custody of the said two quantities; that the product was then and there contained in wooden kegs which were labeled

and addressed to private individuals residing in Kansas City, Mo., and Kansas City, Kan., who had ordered said product and to whom the corporate defendant had shipped the same pursuant to said orders.

2. I find the fact to be that sales of the defendant company's product were made, as charged in the several counts of the indictment charging sales, to the persons to whom they are alleged in the indictment to have been made and at the times and places alleged in the indictment, and that the defendant company did possess for sale the quantities of its product alleged in counts of the indictment XXI to XXVIII, inclusive, to have been possessed by the defendant company for sale.

3. I find the fact to be that the product sold to purchasers as charged in the counts of the indictment alleging sales, and possessed for sale by the defendant company in the counts of the indictment alleging possession for sale, did not at the time of delivery to purchasers, or of possession for sale, contain more than one-half of 1 per cent. of alcohol by volume.

4. I find the fact to be that the product sold by the defendants and possessed for sale by the defendant company, as set out in the preceding findings of facts, was a preparation, compound, and substance manufactured by the defendant company, and that the process of manufacture was to mix together a concentrate or syrup (previously manufactured by another than the defendant company by crushing the whole of grapes and reducing by evaporation the resulting liquid) with water, a form of sugar known as nulomoline, and various flavoring ingredients. And I further find that neither the concentrate nor the liquid sugar or nulomoline separately would undergo the process of fermentation, but that, when mixed together, they were capable of and did ferment so as to have an alcoholic content of one-half of 1 per cent. and more by volume after a period of seven days from their admixture. And I find that the said preparation, compound, and substance was inherently capable of and designed to become, after a process of fermentation, a potable beverage having an alcoholic content of from 8 to 14 per cent. of alcohol by volume.

5. I find the fact to be that the preparation, compound, and substance sold by the defendants, and possessed for sale by the defendant company, was not a fruit juice, and more specifically that it was not grape juice, and that it was not a fruit juice or more specifically grape juice either at the time when it was sold by the defendants or possessed for sale by the defendant company, or when the process of fermentation had been completed and it was in its finished form.

6. I find the fact to be that the defendants sold the preparation, compound, and substance manufactured by the defendant company with the intent and design on their part and that the defendant company possessed for sale said preparation, compound, and substance with the intent and design on its part that the purchasers of said preparation, compound, and substance should use it in the manufacture of wine and a vinous liquor containing more than one-half of 1 per cent. of alcohol by volume and containing from 8 to 14 per cent. of alcohol by volume, and intoxicating in fact, and that the said wine and vinous liquor would be used for beverage purposes, and that the manufacture of said wine and vinous liquor would not be by those who had permits to manufacture such wine and vinous liquor.

7. I find the facts to be that the wine and vinous liquors which were manufactured by the purchasers of the defendant company's preparation, compound, and substance did and would contain more than one-half of 1 per cent. of alcohol by volume, and did and would become intoxicating in fact.

8. I find that all of the foregoing facts have been proved by the plaintiff by competent evidence beyond a reasonable doubt.

### By Way of Conclusion.

The defendants are guilty. Nor is their guilt a technical guilt only. It is real guilt. From the very beginning of their enterprise theirs was not the spirit of the law-abiding citizen. The law-abiding citizen does not resolve that he will come as nearly as he can to a violation of the law, barely avoiding actual violation that he may escape its penalties. These defendants knew the law. They studied it with great care, not that they might know better how to obey it, but that they might find some way to circumvent it. They regarded the letter and cared not for the spirit of the law. Now they are amazed to discover that the laws of their country are not in their letter so inadequate to effect their spirit as they had counted on. The law-abiding citizen must be amazed at their amazement.

What a hodgepodge of absurdities they have resorted to. Manufacture is not manufacture. A preparation, compound, and sub-

stance is not a substance, compound, and preparation. Wine is not wine. Grape juice is not juice of grapes.

A corporation which boasts that its assets are of the value of a million dollars and that its business is nation wide claims the protection of the cloak which Congress designed for the housewife and the home owner who make nonintoxicating fruit juices for their families.

The defendant company sold its preparation to the home owner, taught him in great detail exactly what to do to transform that preparation into an alcoholic beverage, and, having told him exactly what to do, bade him not to do it, but to pasteurize the preparation so that alcohol might not develop in it. And its officers protest that it was their purpose to promote, not violations of law, but obedience to law.

The defendants have shouted from the housetops, though they have been meticulously careful not to use the mails, that what they are selling, and all that they are selling, is the innocent juice of grapes. They are selling this grape juice of theirs at around $4 a gallon retail, when the genuine and pure juice of grapes may be purchased at many a grocery store for one-fourth as much. What constituent does their grape juice have that adds so enormously to its value? The defendants are not selling alcohol. They are only selling a means by which alcohol easily can be obtained. What they buy for cents they sell for dollars. All they have added to what they have bought is not a "kick" but a "kick-to-be." In every sale they make they summon to their aid refrigeration and the fast express for the purpose of getting their "harmless" product out of their possession as quickly as possible lest by some mischance the operation of the laws of nature bring them into conflict with the laws of man.

The defendants have violated the law. The law may not be a good one. The Eighteenth Amendment may not be wise. Whether they are good and wise, so far as the amendment is concerned, is for the people in their sovereign capacity to consider, and, so far as the law is concerned, for Congress to consider. The courts have nothing to do with the wisdom and righteousness of constitutional provisions or of laws. It is their duty to apply the laws as they are written to the facts which evidence may develop.

### As to the Verdict.

The government has charged each alleged offense in three separate ways (in my view of the law the differences between the counts in each group of counts are immaterial), yet each offense is a single one, and there should be a single verdict of guilty as to each defendant for each violation that has been proved. Therefore I shall dismiss for redundancy two of the three counts in each group.

### Verdict and Order Dismissing Certain Counts.

And now the court, sitting as trier of the facts, finds the defendant Albert E. Brunett guilty as charged in counts I, VI, XI, XIII, and XVIII of the indictment and not guilty as charged in counts XXII and XXVIII, and finds the defendant Ukiah Grape Products Company guilty as charged in counts I, VI, XI, XIII, XVIII, XXII, and XXVIII. And the court dismisses as redundant and as to both defendants counts II, III, V, VII, IX, X, XIV, XV, XVII, XIX, XXI, XXIII, XXVI, and XXVII.

It is so ordered and adjudged.