LADY ANN'S ODDITIES, INC., et al., Plaintiffs,

v.

Robert H. MACY, et al., Defendants.

Tariq SHABAZZ d/b/a Nature's Store, Plaintiffs,

v.

Robert H. MACY, et al., Defendants.

Robert L. CONERLY d/b/a ABC Bookstore, Plaintiff,

v.

Robert H. MACY, et al., Defendants.

Nos. CIV–81–500–BT, CIV–81–501–BT and CIV–81–504–BT.

United States District Court, W. D. Oklahoma.

July 23, 1981.

Arthur R. Angel, Oklahoma City, Okl., W. Greekmore Wallace, II, Sapulpa, Okl., Garvin A. Isaacs, Oklahoma City, Okl., for Lady Ann's Oddities, Inc., et al.

David C. Hood, Oklahoma City, Okl., for Tariq Shabazz d/b/a Nature's Store.

Joe Farnan, Ballard & Farnan, Purcell, Okl., for Robert L. Conerly d/b/a ABC Book Store.

Walter Powell, City Atty., Fred Anderson, Asst. Municipal Counsel, Stephen Korotash and George W. Paull, Jr., Asst. Dist. Attys., Robert H. Macy, Dist. Atty., Seventh Judicial Dist., Jan Eric Cartwright, Atty. Gen. of Okl., Gary W. Gardenhire and William Roy Holton, Jr., Asst. Attys. Gen., Oklahoma City, Okl., Karen Huff, Dist. Atty., Twenty First Judicial Dist., Rebecca J. Patten, Asst. Dist. Atty., Douglas Juergens, City Atty. of City of Norman, Norman, Okl., for defendants.

## MEMORANDUM OPINION

BRETT, District Judge.

On April 13, 1981 the Governor of Oklahoma signed into law S.B. 114 which proscribes the use, possession, manufacture or delivery [transfer or sale] of "drug paraphernalia." The same day, plaintiff Lady Ann's Oddities, Inc., et al., brought this action for a Temporary Restraining Order enjoining enforcement of the Act and sought a judgment declaring the Act unconstitutional. Shortly thereafter, two identical suits were filed requesting the same relief. By stipulation of the parties, all three cases have been consolidated into the present action.[1]

Plaintiff's request for a Temporary Restraining Order under F.R.Civ.P. 65(b) was effectively denied when the matter was set down for hearing on a preliminary injunction. After a series of hearings both in Oklahoma City (Western District) and Tulsa (Northern District), plaintiffs' counsel advised their respective clients to reopen their businesses, they having temporarily closed when the Act was signed into law. Lacking the requisite element of irreparable harm, plaintiffs withdrew the Application for Preliminary Injunction. The matter is now at issue and before the Court on plaintiffs' consolidated request for a declaratory judgment that S.B. 114 is unconstitutional.

---

1. Cases identical to the instant case were also filed by plaintiffs' counsel in the Eastern District of Oklahoma (assigned to Judge Frank Seay) and the Northern District (assigned to this Court).

The Act contains essentially four parts: Section 1, defining terms including "drug paraphernalia"; Section 2, enumerating certain "logically relevant factors" that may be considered by a court of law· to determine whether an object is "drug paraphernalia"; Section 3, establishing four substantive offenses and prescribing punishment; and Section 4, detailing objects subject to forfeiture pursuant to a violation of the Act.

The Act is patterned after the so-called Model Act (MDPA) drafted by the Drug Enforcement Administration of the United States Department of Justice. The Model Act in various forms has been the subject of extensive prior litigation. *See e. g., Hejira Corporation, d/b/a Budget Records and Tapes, Inc., et al., v. J. D. MacFarlane, et al.* (10th Cir. 1981) 660 F.2d 1356; *Record Revolution No. 6, Inc. v. City of Parma,* 638 F.2d 916 (6th Cir. 1980) (cited hereinafter as "*Parma* (6th Cir.)")[2]; *The Casbah, Inc. v. Thone,* 651 F.2d 551 (8th Cir., 1981); *Back Door Records v. City of Jacksonville,* 515 F.Supp. 857 (E.D.Ark., 1981); *Nova Records, Inc. v. Sendak,* 504 F.Supp. 938 (S.D.Ind.1980); *The Town Tobacconist v. Degnan,* Superior Court of New Jersey, Chancery Division, March 12, 1981; *New England Accessories Trade Association v. Browne,* 502 F.Supp. 1245 (D.Conn.1980); *New England Accessories Trade Association v. City of Nashua,* No. 80–530–D (D.N.H. Dec. 8, 1980); *Brache v. County of Westchester,* 507 F.Supp. 566 (S.D.N.Y.1981); *Lazy J, Ltd. v. Borough of State College,* No. 80–1167 (M.D.Pa. Jan. 30, 1981); *World Imports, Inc. v. Woodbridge Township,* 493 F.Supp. 428 (D.N.J.1980); *Mid-Atlantic Accessories Trade Assn. v. State of Maryland,* 500 F.Supp. 834 (D.Md.1980); *Delaware Accessories Trade Assn. v. Gebelein,* 497 F.Supp. 289 (D.Del.1980); *Florida Business Men for Free Enterprise v. State of Florida,* 499 F.Supp. 346 (N.D.Fla.1980); *Weiler v. Carpenter, et al.,* 507 F.Supp. 837 (D.N.M. 1981); *General Stores, Inc. v. City of Albuquerque,* No. 81–0027–M Civil (D.N.M. March 25, 1981); *Florida Businessmen for Free Enterprise v. City of Hollywood,* No. 80–6157–Civ–NCR (S.D.Fla. Aug. 29, 1980); *Tobacco Accessories and Novelty Craftsmen Merchants Association of Louisiana v. Treen,* 501 F.Supp. 168 (E.D.La.1980). *See also Record Revolution No. 6 v. City of Parma, Ohio,* 492 F.Supp. 1157 (N.D.Ohio E.D.1980) (cited hereinafter as "*Parma* (N.D.Ohio E.D.)"). Moreover, in an apparent effort to overcome the constitutional objections raised by the Court in *Parma* (6th Cir.), the Oklahoma legislature deleted certain provisions otherwise contained in the Model Act. Furthermore, the legislature added an exclusionary clause not in the Model Act which states as follows: "Provided, however, drug paraphernalia shall not include separation gins intended for use in preparing tea or spice, clamps commonly used for constructing electrical equipment, water pipes designed for ornamentation or pipes designed for smoking tobacco." *See* Section 1.

Plaintiffs contend that the statute is vague and overbroad, that it violates the due process clause because it is not rationally related to any legitimate state goal and constitutes an unlawful taking of property, that it is an impermissible restraint upon freedom of speech, and that it violates the equal protection and commerce clauses of the United States Constitution.

## I.

█ The threshold question for the Court is whether the Act presents a case or controversy such that declaratory relief is appropriate. It is settled law that a genuine threat of criminal prosecution under legislation that allegedly is constitutionally defective does present an actual case or controversy. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In the present case, the facts demonstrate that the threat of prosecution of plaintiffs under the Act is not "imaginary", "speculative" or "chimerical." *Compare Id.* Furthermore, two Federal Circuit Courts of

---

**2.** By Order of May 26, 1981, the judgment in *Parma* (6th Cir.) was vacated by the Supreme Court and remanded to the Sixth Circuit for further consideration in light of the recently enacted Section 2925.4 of the Ohio Revised Code.

Appeal have held that legislation similar to this statute presents a threat of criminal prosecution sufficient to constitute an actual case or controversy. *See Parma* (6th Cir.) and *High Ol' Times, Inc. v. Busbee,* 621 F.2d 135 (5th Cir. 1980). Therefore, this matter constitutes an actual case or controversy such that declaratory relief is appropriate.

### II.

■ Prior to an adjudication of the merits of this case, the Court must determine whether it is more appropriate to refrain from exercising jurisdiction under the abstention doctrine. As articulated in *Railroad Commission of Texas v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the abstention doctrine "counsels abstention in narrowly limited special circumstances...", "... where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) quoting *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). Three United States Courts of Appeal have concluded that the *Pullman* doctrine should not be invoked with respect to legislation similar to S.B. 114. *See The Casbah, Inc. v. Thone, supra; Parma* (6th Cir.) and *High Ol' Times, Inc. v. Busbee, supra.* The Court concluded in these cases abstention was not proper because the law was challenged on its face and the issues raised were predominantly questions of federal constitutional law. *Compare Steffel v. Thompson, supra.*

In the present case, the statute comes before this Court for a review of its facial validity and clearly raises questions of federal constitutional law. Therefore, abstention is not the proper course of action.

### III.

The authority of the federal district court to assess the constitutionality of a state statute is extremely limited. It is settled law that constitutional questions are not to be entertained in federal courts in the absence of the strictest necessity. *Taylor v.* *United States,* 320 F.2d 843 (9th Cir. 1963) cert. denied 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964).

■ In addition, the scope of a constitutional inquiry into a state statute is substantively constrained. When a due process challenge to a legislative enactment is presented, the doctrine of separation of powers requires that the Court may examine only the constitutionality and not the wisdom of the legislation. *Provost v. Betit,* 326 F.Supp. 920 (D.Vt.1971). In determining the validity of the statute the Court's task is not to resolve issues of policy. *Millard v. Harris,* 406 F.2d 964 (D.C.Cir.1968). The courts are not guardians of liberties of people against the press of legislation which does not violate constitutional provisions and are not concerned with the expediency, necessity, utility and propriety of legislation as long as constitutional principles are not violated. *See Sims v. Board of Education of Independent School District No. 22,* 329 F.Supp. 678 (D.N.M.1971).

■ Once the narrow issue of constitutionality has been reached, the Court must consider the inherent limitations on its ability to construe the statute. It is settled law that a presumption of constitutionality attaches to all state statutes. *E. g. Wells v. Hand,* 238 F.Supp. 779 (M.D.Ga.1965) *aff'd. sub nom., Wells v. Reynolds,* 382 U.S. 39, 86 S.Ct. 160, 15 L.Ed.2d 32 (1965). If possible the Court should not construe a statute in such a manner as to raise a serious constitutional issue. *Civil Aeronautics Board v. United Airlines, Inc.,* 399 F.Supp. 1324 (N.D.Ill.E.D.1975). Where it is fairly possible to construe a statute so as to avoid the question of its constitutionality a federal court should do so. *See Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). In the present case, S.B. 114 was duly passed by the State legislature and signed into law by the Governor of Oklahoma. Therefore, the principles of restraint must guide this Court in its analysis and construction of the statutory provisions.

## IV.

The doctrine of vagueness is embodied in the due process clauses of the Fifth and Fourteenth Amendments. Due process incorporates notions of fair notice or warning. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). As the Supreme Court stated in *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926):

> "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

*Accord, Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). Furthermore, as the Court stated in *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939), when a criminal statute is involved, ". . . [n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."

Due process has two requirements: that laws provide notice to the ordinary person of what is prohibited and that they provide standards to law enforcement officials to prevent arbitrary and discriminatory enforcement. As the Supreme Court stated in *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972):

> "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

There is concern that lawmaking will be entrusted "to the moment-to-moment judgment of the policeman on his beat." *Gregory v. City of Chicago*, 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969).

However, the vagueness doctrine does not invalidate every ordinance that could have been drafted more precisely. *See e. g. Arnett, Director, Office of Economic Opportunity v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Reasonableness, not absolute certainty, of draftsmanship is required. *Tobacco Road v. City of Novi*, 490 F.Supp. 537 (E.D.Mich.S.D.1979). Many ordinances are inherently ambiguous because "[i]n most English words and phrases there lurk uncertainties." *Robinson v. United States*, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945). As the Supreme Court stated in *Boyce Motor Lines v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952):

> "[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."

The test is whether the enactment presents "ascertainable standards of guilt." *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

The overbreadth doctrine prohibits a statute from making criminal otherwise innocent and constitutionally protected conduct. *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973), *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). The statutory language may be very clear yet "sweep unnecessarily broadly to invade the area of protected freedoms." *Sawyer v. Sandstrom*, 615 F.2d 311 (5th Cir. 1980).

The harm from an overbroad statute is its chilling effect on constitutionally protected or otherwise lawful conduct. *Parma* (6th Cir.).

In applying these constitutional principles the Court is guided by a rebuttable presumption that legislative enactments are valid unless it is shown that the statute or ordinance in question is violative of rights secured by the United States Constitution. *United States v. Kiffer*, 477 F.2d 349 (2nd Cir. 1973), *cert. den.* 414 U.S. 831, 94 S.Ct. 62, 38 L.Ed.2d 65. Moreover, the Court should favor an interpretation of the enactment which supports constitutionality. *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Finally, all laws should receive a sensible construction. *United States v. Ryan*, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224 (1931). As the Court stated:

> "A literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose."

*Id.* at 175, 52 S.Ct. at 68.

### V.

■ The primary focus of the Court in determining the constitutionality of S.B. 114 is the definition of the term "drug paraphernalia." As the Court stated in *Parma* (6th Cir.) at 927–928:

> "If the definition of 'drug paraphernalia' is vague or overbroad in any respect the ordinances must be declared unconstitutional. A precise and unambiguous definition of drug paraphernalia is critical because the ordinances seek to ban in certain circumstances only the sale of every day items that have a myriad of innocent, lawful and beneficial purposes. To pass constitutional muster the ordinances must specify clearly the very limited circumstances in which the manufacture, sale or use of these common items is unlawful."

The key phrase used by the statute to separate lawful from unlawful items is "used or intended for use." The definition of "drug paraphernalia" turns on the actions of a person or the state of mind of a person with respect to the alleged offending object. Plaintiffs contend first that the statute violates due process by allowing a defendant to be arrested, prosecuted and convicted for the acts or state of mind of another person. For example, if the purchaser uses a pipe to smoke marijuana, the statute arguably permits the seller of the pipe to be arrested, prosecuted or convicted on the basis of the purchaser's use. Similarly, if the manufacturer intends that a chamber pipe be used for inhaling hashish and the purchaser so uses the chamber pipe, the statute arguably permits the seller, who lacked such intent and did not use the chamber pipe himself to inhale hashish, to be arrested, prosecuted or convicted on the basis of the manufacturer's intent and the purchaser's use.

The phrase "used or intended for use" refers only to the acts or intent of the individual charged with a violation of the statute. *Accord, Hejira Corporation v. J. D. MacFarlane, et al., supra.* Therefore, the statute permits a person to be arrested, prosecuted or convicted only for that person's own use or intent. *Parma* (6th Cir.). This construction comports with the fundamental principle of due process that a criminal act requires a criminal intent on the part of the person charged. *See e. g. United States v. U. S. Gypsum Company*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). "The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951). Furthermore, this construction is consistent with the comments of the drafters of the Model Act as follows:

> "To insure that innocently possessed objects are not classified as drug paraphernalia [the definition] makes the knowledge of *criminal intent of the person in control of an object* a key element of the definition. Needless to say, inanimate objects are neither good nor bad, neither lawful nor unlawful. Inanimate objects do not commit crimes but when an object is controlled by people who use it illegally or who intend to use it illegally ... the

object can be subject to control and the people subjected to prosecution. [The definition] requires therefore that an object be used [or] intended for use ... in connection with illicit drugs before it can be controlled as drug paraphernalia." (Emphasis added)

*See Parma* (N.D.Ohio E.D.) at 1166–1167 quoting MDPA, Comment, pages 6 through 7, 1979. Finally, this construction parallels the criminal law of Oklahoma for possessory offenses requiring the person charged have knowledge of the presence of a proscribed item and the power and intent to control its disposition or use. *See e. g. Brown v. State*, 481 P.2d 475 (Okl.Cr.1971).

The Court notes that to construe S.B. 114 so as to permit the criminal prosecution of an individual based upon the intent of another would render the statute constitutionally infirm. *See e. g. Weiler v. Carpenter*, 507 F.Supp. 837 (D.N.M.1981). However, such a construction would be contrary to the responsibility of this Court to read the statute in a manner consistent with the Constitution. *See Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

The presence of a culpable intent standard may save what might otherwise be a vague statute. *See e. g. Boyce Motor Lines v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952). In the present case, Section 1(32) refers to objects "used or intended for use" in conjunction with controlled dangerous substances. In view of the proper construction discussed above, this inclusionary language complies with the requirements of the Constitution. *Accord Hejira Corporation, d/b/a Budget Records and Tapes, Inc., et al., v. J. D. MacFarlane, et al., supra; Parma* (6th Cir.).

However, Section 1(32) also contains an exclusionary clause as follows:

"Provided, however, drug paraphernalia shall not include separation gins *intended for use* preparing tea or spice, clamps *commonly used for* constructing electrical equipment, water pipes *designed for* ornamentation or pipes *designed for* smoking tobacco." (Emphasis added)

Plaintiffs argue that the Sixth Circuit specifically held the language "designed for" is unconstitutionally vague and consequently this proviso renders the statute fatally defective. *Compare Parma* (6th Cir.). Therefore, the issue becomes whether the language contained in this exclusion is sufficiently precise to withstand a constitutional challenge.

The first items described in the proviso are "separation gins intended for use in preparing tea or spice." As discussed above, the phrase "intended for use" refers to the intent of the person charged. Consequently, this language complies with the requirements of the Constitution.

The second items of the proviso, "clamps commonly used for constructing electrical equipment", present a more difficult problem. The term "commonly used" does not refer to the intent of the user. Rather, the language suggests that certain objective characteristics may exempt a clamp from the definition of drug paraphernalia. Clearly, a clamp "commonly used for constructing electrical equipment" cannot be defined with precision. Consequently, this section fails to provide an individual with adequate notice as to whether a clamp in his possession is in fact drug paraphernalia. Therefore, on its face the phrase "commonly used for constructing electrical equipment" is unconstitutionally vague.

The Court notes that if the exemption were construed to read "clamps used for constructing electrical equipment" the language would comport with constitutional standards. Furthermore, such a reading would not disturb the clear intent of the legislation. The objective of this proviso appears to be to emphasize that certain common objects, when used for their intended lawful purpose, will not become "drug paraphernalia" unless "used or intended for use" in conjunction with controlled dangerous substances.

However, the Court further notes that to excise language contained in the exclusionary clause in effect may extend the reach of the substantive offense section of the Act. For example, an individual who smokes a

marijuana cigarette with the aid of a clamp that is without question "commonly used for constructing electrical equipment" arguably may not be charged under S.B. 114. However, if the word "commonly" is deleted from the statute, the same person acting in the same manner undoubtedly is subject to prosecution under the Act. Clearly, this result cannot obtain. The legislature cannot be deemed to have intended to punish anyone who is not "plainly and unmistakably" within the confines of the statute. *See United States v. Lacher*, 134 U.S. 624, 628, 10 S.Ct. 625, 626, 33 L.Ed. 1080 (1890); *United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 411, 61 L.Ed. 857 (1916). Therefore, the exclusionary clause must be construed in such a way that the individual in the above hypothetical is subject to prosecution whether or not the clamp in question is "commonly used for constructing electrical equipment." Concededly, this result renders meaningless this portion of the exclusionary clause. *Compare United States v. Ryan*, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224 (1931). However, the alternative is to invalidate S.B. 114 on the grounds that the exemption for electrical clamps is not sufficiently precise. *Compare Parma* (6th Cir.). Therefore, if within the authority of the Court, the term "commonly" should be excised from the Act.

The Act specifically contemplates judicial excision of constitutionally offensive provisions. *See* Section 6. The appropriate test is "whether the void provision and the valid provision are essentially and inseparably connected and independent, one with the other, so that it cannot be presumed that the legislature would have enacted the valid provisions without the void one." *Hejira Corporation, d/b/a Budget Records and Tapes, Inc., et al v. J. D. MacFarlane, et al.*, 660 F.2d at 1362. As the Supreme Court stated in *Champlin Refining Co. v. Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932):

"The unconstitutionality of a part of an Act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently

of that which is not, the invalid part may be dropped if what is left is fully operative as a law."

In the present case the term "commonly" as used in the last paragraph of Section 1(32) serves only to confuse the meaning of S.B. 114. Furthermore, excision of the term "commonly" results in a reasonable construction in accordance with the clear intent of the Act. Therefore, the term "commonly" should be deleted from the exclusionary clause. Cf. *Hejira Corporation, d/b/a Budget Records and Tapes, Inc., et al v. J. D. MacFarlane, et al., supra* (deleting the term "adapted" from a Colorado paraphernalia statute).

The third and fourth items described in the exemption are "water pipes designed for ornamentation or pipes designed for smoking tobacco." The Court in *Parma* (6th Cir.) held that the phrase "designed for use" is vague and overbroad, citing with approval the reasoning stated in *Indiana Chapter, NORML, Inc. v. Sendak*, No. TH 75–142 (S.D.Ind. February 4, 1980) as follows:

"The term 'designed' could signify only devices that have no use or function other than as a means to ingest a controlled substance. Alternatively, 'designed' could include any devices that have a legitimate function but could be used for ingestion of drugs. That is, the term 'designed' could sweep into the definition of paraphernalia any device that could be altered from its normal function to become a makeshift drug device, such as a paper clip, tie bar, hand mirror, spoon, or piece of aluminum foil. The definition 'designed for drug use' gives no hint to those attempting to comply with I.C. 35–48–4–8 what is included in the definition. The definition fails to make clear what items are included in the statutory prohibition and what items are not."

The Court in *Parma* (6th Cir.) at 930 concluded:

"Vagueness enters in our case once the ordinances begin to define drug paraphernalia in *terms* of the primary adaption or dominant purpose of the de-

sign. Thus the definition begins to depend upon the ingenuity or purpose of the purchaser rather than the seller and upon the current practices of the clandestine society of drug users. *Geiger v. City of Eagan,* 618 F.2d 26 (8th Cir. 1980); *Music Stop, Inc. v. City of Ferndale,* 488 F.Supp. 390 (E.D.Mich.1980)."

For the reasons discussed below and in view of the responsibility to give the statute a constitutional construction if possible, the Court declines to adopt the reasoning of the Sixth Circuit. *Accord The Casbah, Inc., v. Thone, supra; Delaware Accessories Trade Assn. v. Gebelein, supra; Mid-Atlantic Accessories Trade Assn. v. State of Maryland, supra; see also Parma* (E.D.Ohio N.D.).

If the term "designed for" referred to the shape, appearance or structure of the objects in question, it would clearly be unconstitutionally vague. *See Parma* (6th Cir.). However, the Court concludes that in this context "designed for" refers to the intent of the individual with knowledge and control of the object in question. *Accord Hejira Corporation, d/b/a Budget Records and Tapes, Inc., et al., v. J. D. MacFarlane, et al., supra.*

The primary definition of the word "design" is "a mental project or scheme in which means to an end are laid down." Webster's Third New International Dictionary (Merriman Co., Springfield, Mass.1976). Not until the sixth of seven definitions is the word defined in terms of structure, as follows: "the arrangement of elements that make up a work of art, a machine, or other man-made object." As the Court concluded in *Delaware Accessories Trade Assn. v. Gebelein, supra,* at 291:

"Thus, the word 'design' does not lead in the first instance to an examination of the suitability of the physical features of an item for use with drugs but rather to whether someone plans or designs that it be used to violate drug laws."

The provisions of the statute itself indicate that "designed for" refers to intent and not to structure. Specifically, Section 2 of the Act enumerates certain "logically relevant factors" that may be considered by a Court in determining whether an object is "drug paraphernalia." None of the factors listed refers in any way to the physical attributes of an object. Rather, as the Court in *Delaware Accessories Trade Assn.,* observed, the factors "relate to the *context* in which an object is found at a given point in time and constitute what would normally be regarded in the law as circumstantial evidence of the intent or design of those dealing with the object at that time ..." *Id.* at 291–292. The Court properly concluded:

"Thus, the list suggests that an object having one set of physical characteristics may be drug paraphernalia at one time and not at another depending upon which those dealing with it at a particular time have in their minds."

Finally, the appropriate construction of the term "designed for" has been determined previously by the courts in the analogous context of the National Prohibition Act. In *Danovitz, Surviving Partner of Feitler Bottle Company v. United States,* 281 U.S. 389, 390, 50 S.Ct. 344, 74 L.Ed. 923 (1930), the Supreme Court stated:

"As used in § 25, the term 'property *designed for* the manufacture of liquor intended for use in violating this chapter' has a dual meaning, as follows:

(a) The property must be usable in the process of making liquor

(b) The property must be intended by the owner to be so used by himself ..." (Emphasis added)

*See also Israel v. United States,* 63 F.2d 345 (3rd Cir. 1933); *Street v. Lincoln Safe Deposit Co.,* 254 U.S. 88, 41 S.Ct. 31, 65 L.Ed. 151 (1920).

Similarly, the Court stated in *United States v. Brunett,* 53 F.2d 219 (W.D.Mo. 1931):

"My view is that the words 'designed' and 'intended' must be construed to include a design and intention on the vendor's part that the preparation, compound, and substance sold by him will be used in the unlawful manufacture of intoxicating liquor. Such a construction is the one most favorable to one accused. It has never been the policy of the law to make

an act innocent in itself criminal if the actor had no wrongful purpose of intent. It is scarcely to be thought that Congress proposed to make the mere sale of a preparation, compound, or substance a crime unless the seller had also an intention and design that what was sold by him should be used in the commission of a crime. Certainly Congress did not intend that he should be guilty of an offense because the manufacturer, if he were other than the vendor, designed the preparation, compound, and substance for an ultimate unlawful use, or because the purchaser so intended to employ it."

Accord *Parma* (N.D.Ohio E.D.); *Delaware Accessories Trade Assn. v. Gebelein, supra.*

In the present case, S.B. 114 exempts "water pipes designed for ornamentation and pipes designed for smoking tobacco." This exclusion appears to be no more than legislative emphasis on the fact that an item is not "drug paraphernalia" under the Act when used without the proscribed intent.

In view of the above, this Court concludes that Section 1, including the exclusionary provision, may be construed in a way that is not unconstitutionally vague.

■ The Court further concludes that S.B. 114 is not overbroad. In this case the issue of overbreadth is closely related to the vagueness argument. In essence, plaintiffs contend that those subject to the Act will not be able to tell what it prohibits and will be reluctant to exercise constitutional rights that may arguably bring them within the sweep of the Act. However, S.B. 114 is not impermissibly vague. As the Court stated in *Mid-Atlantic Accessories Trade Assn. v. State of Maryland, supra* at 847:

"Reasonable people can readily tell whether their conduct will be violative of the law because it is their own state of mind which is ultimately determinative."

Under this appropriately narrow construction, the Act bans no conduct protected by the Constitution.

## VI.

Section 2 of the Act states in part: "In determining whether an object is 'drug paraphernalia', a Court *shall* consider, in addition to all other logically relevant factors, the following ..." (Emphasis added) The statute sets forth twelve such "factors" which can best be characterized as items of circumstantial evidence.

In *Parma* (6th Cir.) the city ordinance provided in applicable part "a court or other authority *should* consider ..." certain items of evidence. The Court concluded that this section was not intended "to supersede any rules of evidence" and "naturally incorporates" the principles of due process. *Id.* at 933–934.

■ In the present case, the statute directs that "a court *shall* consider..." the factors enumerated in Section 2. The word "shall" in S.B.114 must be given the same construction as the term "should" in the Parma city ordinance. Therefore, items of circumstantial evidence are admissible in court only if they are consistent with existing rules of evidence and constitutional protections.

Furthermore, it should be emphasized that "drug paraphernalia" cannot be defined by mere conformance with certain "factors." As the Court stated in *Mid-Atlantic Accessories Trade v. State of Maryland, supra* at 846:

"[The items of evidence] are ... only guides for determining whether the necessary criminal intent exists. To convict under the statute, a jury must still find beyond a reasonable doubt that a defendant had the requisite criminal intent. That these factors are relevant evidence of intent does not negate the fact that the statute clearly requires proof of specific intent before a violation can be found."

In the present case, plaintiffs challenge the constitutionality of certain "factors" contained in Section 2. The items at issue are discussed separately below.

■ Section 2(2) provides as follows: "the proximity of the object, in time and space, to a direct violation of this act." In Oklahoma, circumstantial evidence is admissible to show that the defendant knew of

the presence of contraband and had the ability to control its disposition or use. *See Staples v. State,* 528 P.2d 1131 (Okl.Cr. 1974). Therefore, this provision is constitutionally valid. As noted above, this conclusion in no way diminishes the burden on the prosecutor to prove beyond a reasonable doubt the criminal intent of the accused. Furthermore, it is well settled that guilt must be based on personal actions, statements or knowledge, not on association with other persons suspected of criminal conduct. *Sawyer v. Sandstrom,* 615 F.2d 311 (5th Cir. 1980)

■ In part, Section 2(5) provides as follows:

" ... the innocence of an owner or of anyone in control of the object as to a direct violation of this act shall not prevent a finding that the object is drug paraphernalia."

In part, plaintiffs assert, "When this criteria is added to the forfeiture provisions of Section 2–503(6), it becomes obvious that discriminatory and arbitrary enforcement can lead to economic nightmares for even innocent retailers." Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 10. The Court cannot agree with this conclusion.

As plaintiffs observe, Section 2(5) must be read in the context of Section 2–503(6).[3] Accordingly, this proviso merely emphasizes that an object may be subject to forfeiture under Section 2–503(6) even when the owner or someone in control of the object does not have the proscribed intent. For example, this result may obtain if the actual owner loans an object to a third party. The third party has the proscribed intent in regard to the object and is charged under the Act. The object is then subject to forfeiture despite the innocence of the true owner. Similarly, two individuals may share "control" of an item. One individual has the proscribed intent with respect to the object and is charged under the Act. The item is subject to forfeiture despite the innocence of a person "in control" of the

object. In light of this construction, Section 2(5) is constitutionally valid.

■ Section 2(9) provides as follows:
"Whether an owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products."

In reference to this section, the District Court in *Parma* (N.D.Ohio E.D.1980) stated:

" ... the reference to 'legitimate' suppliers creates a danger of arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford, supra.* Because the provisions of this Ordinance apply to *all* who use, distribute or advertise even an innocent item with the requisite intent, the term 'legitimate' supplier is imprecise and misleading...."

However, according to the Parma city ordinance the enumerated factors are for consideration by "a court or *other authority.*" (Emphasis added) The district court opinion characterized the items in Section 2 as "indicia which law enforcement authorities may use to determine whether an object is 'drug paraphernalia.'" *Id.* at 1170–1171. The present Act refers only to consideration by "a court." Therefore, the concern that Section 2(9) will result in "arbitrary and discriminatory enforcement" is unfounded.

The language of Section 2(9) describes an item of circumstantial evidence. The purpose of such circumstantial evidence is to show the accused had the proscribed intent. As the Court concluded in *Mid-Atlantic Accessories Trade Association v. State of Maryland, supra* at 846:

"Intent can logically be supported by proof of the offering for sale in a store of a combination of items which makes sense only in the context of the drug trade."

Therefore, Section 2(9) is constitutionally valid.

In applicable part, Section 2(10) provides as follows:

**3.** Section 2–503 provides: "The following shall be subject to forfeiture ... (6) All drug para-

phernalia as defined by this Act."

"Direct or circumstantial evidence of the ratio of sales of the object or objects to the total sales of the business enterprise."

■■■ This section permits circumstantial evidence showing the percentage of a merchant's total volume of sales attributable to the object alleged to be "drug paraphernalia" and like items. If the ratio is high, the total sales of the accused includes a significant percentage of such items. From this calculation, the trier of fact may ascertain whether a merchant specializes in certain items. Presumably, this fact suggests a greater likelihood that the defendant is engaged in the trade of drug paraphernalia. The terms of this provision are not vague. Moreover, it will be for the trial court in each case to determine whether such circumstantial evidence is relevant to the central question of the accused's intent. In light of such judicial protection, this provision is constitutionally valid.

■■■ In applicable part, Section 2(11) provides:

"The existence and scope of legitimate uses for the object in the community."

For the reasons discussed above, in the context of Section 2(9) the term "legitimate" will not lead to "arbitrary and discriminatory enforcement." Therefore, Section 2(11) is constitutionally valid.

In summary, it should be stressed that the items contained in Section 2 are not intended to supersede the Oklahoma rules of evidence [4] and cannot infringe upon the due process protections provided for in the Oklahoma and United States Constitutions. Any court conducting a criminal proceeding under the provisions of this statute will no doubt be guided accordingly. *Accord Parma* (6th Cir.)

### VII.

■■■ Section 3 of S.B. 114 establishes four substantive offenses and prescribes punishment for violations of the Act. Section 3(A) is presently contained in 63 O.S. 1971, § 2–405 and is not related to the constitutional challenge presently before the Court.

In applicable part, Section 3(B) provides as follows:

"No person shall use or possess drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled dangerous substance in violation of this act *who cannot show any medical or other need requiring the same,* except those persons holding an unrevoked license in the professions of podiatry, dentistry, medicine, nursing, optometry, osteopathy, veterinary medicine or pharmacy." (Emphasis added)

This provision modifies the current statute, 63 O.S.1971 § 2–405, which states as follows:

"B. No person shall have in his possession or immediate control any paraphernalia used by abusers of controlled dangerous substances for administering a controlled dangerous substance who cannot show any medical or lawful need requiring the same except those persons holding an unrevoked license in the professions of podiatry, dentistry, medicine, nursing, optometry, osteopathy, veterinary medicine or pharmacy."

This statute was examined in some depth by the Oklahoma Court of Criminal Appeals in the case of *Cole v. State,* 511 P.2d 593 (Okl.Cr.1973) The Court of Criminal Appeals concluded that the statute was unconstitutional for two reasons: (1) the term "paraphernalia" was not defined with sufficient precision; and (2) a burden is placed on the defendant to come forward with proof of his innocence. The Court stated in *Cole :*

"We further believe the statute is invalid for the reason that it shifts the burden to the defendant to show his innocence. Under this statute, all the State is required to prove is that the defendant was in possession of 'paraphernalia used by abusers of controlled dangerous substances for administering a controlled

4. 12 O.S.A. § 421 *et seq.*

dangerous substance,' then the burden shifts to the defendant to prove that he possessed the article for 'a medical or other lawful need.' This is contrary to the basic concept of criminal justice that the 'defendant is innocent until proven guilty.' "

The amendments to Section 3(B) contained in the Act including the new definition of the term "drug paraphernalia", do not cure all the defects identified by the Oklahoma Court of Appeals. Under the language of S.B. 114 the defendant is still required to come forward with evidence of "a medical or other lawful need." This shifting of the burden to the defendant is contrary to the protections of due process and therefore is constitutionally impermissible. Therefore, in accordance with the holding of Cole v. State, supra, Section 3(B) is hereby excised from the Act.

■■■ In applicable part, Section 3(C) provides as follows:

"No person shall deliver, possess or manufacture drug paraphernalia knowing, or under circumstances in which it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled dangerous substance in violation of this act."

Plaintiffs submit essentially two challenges to this charging section: (1) the Act contains no exemption for law enforcement personnel and therefore inadvertently marks as illegal activities which society clearly favors; and (2) the language "under circumstances in which" is unconstitutionally vague.

The present Act, S.B. 114, must be read in the context of the Uniform Controlled Dangerous Substances Act, 63 O.S. § 2–101 et seq. Article 5 provides that a peace officer is empowered to "perform such other duties as are required to carry out the provisions of this Act." 63 O.S. § 2–501(5). A "peace officer" is defined as a police officer, sheriff, deputy sheriff, district attorney's investigator or any other person elected or appointed by law to enforce any of the criminal laws of this state or of the United States." 63 O.S. § 2–101(24). Therefore, it is clear that a law enforcement officer, duly appointed by law, is empowered to "test", "analyze", etc., drug paraphernalia under this Act so long as it is in keeping with his "lawful duties as required to carry out the provisions of this Act." Consequently, the lack of a specific law enforcement exemption in Section 3(C) does not constitute a defect.

The phrase "under circumstances in which" raises more serious problems. As noted above, the Oklahoma legislature made a sincere attempt to modify the Model Act in such a way as to come within the terms of Parma (6th Cir.). In Parma (6th Cir.) the Circuit Court struck down as unconstitutionally vague the standard "under circumstances where one reasonably should know" contained in the Model Act. In applicable part the Model Act examined by the Sixth Circuit provided:

"It is unlawful for any person to deliver, sell, possess with intent to deliver or sell, or manufacture with intent to deliver or sell, drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, etc., etc., . . ."

The Sixth Circuit concluded that "the 'reason to know' standard is vague and overbroad. . . . Because most uses of the outlawed items are lawful and common, the 'reason to know' standard is too open-ended and too susceptible to misapplication to satisfy the dictates of due process." Parma (6th Cir.) at 935–936.

In apparent recognition of the fact that the "reasonably should know" standard was struck down by the Sixth Circuit, the Oklahoma legislature deleted those precise words from the charging section of S.B. 114. Unfortunately, the result, "under circumstances in which" either creates a lower standard than the "reasonably should know" standard struck down by the Sixth Circuit or defies definition. In brief the Attorney General suggests that the "under circumstances" language should be given a constitutional construction in line with the

"knowing" requirement contained in this section. In oral argument the Attorney General suggested that the language "under circumstances in which" is more in the nature of a typographical error and simply should be ignored by the Court. In either case, the language "under circumstances in which" is unconstitutionally vague and therefore is hereby excised from the Act.

### VIII.

In addition to the arguments regarding vagueness and overbreadth plaintiffs advance a number of other constitutional challenges to S.B. 114. The Court concludes that these arguments are not persuasive. Each such argument shall be treated separately below.

### DUE PROCESS

█ The concept of due process requires that all legislation be a reasonable means of achieving a legitimate state goal. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Courts have consistently held that there is a rational relationship between banning drug paraphernalia and curbing drug abuse. *See e. g. Geiger v. City of Eagan*, 618 F.2d 26 (8th Cir. 1980). Indeed a number of courts have specifically concluded after a review of medical and other evidence, that drug paraphernalia and drug abuse are rationally related. *See Williams v. Spencer*, 622 F.2d 1200 (4th Cir. 1980). *See also Mid-Atlantic Accessories Trade Assn. v. State of Maryland, supra*. To hold that a rational relationship is present is consistent with the conclusion reached by every Federal court that has examined this issue.

In addition, it should be noted that the legislature is given great latitude in determining what statutes it chooses to pass. The legislature is not limited to passing laws it is sure will work completely but may "deal with one part of a problem without addressing all of it." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). Moreover, a legislature is entitled to experiment. *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952).

The role of the court in determining whether particular legislation lacks a rational basis is not to judge anew the wisdom of the statute. That has been done by the legislature whose task it is. The legislature is presumed to have acted correctly and their enactments are presumed to be constitutional. *Exxon Corp. v. Governor of Maryland, supra*. In view of this authority and the record presently before the Court, the Court concludes that the plaintiffs have not rebutted this presumption. *Accord Mid-Atlantic Accessories Trade Assn. v. State of Maryland, supra*.

### FOURTH AMENDMENT CLAIMS

█ Plaintiffs assert that the Act will in some way enable police to make searches without the probable cause contemplated by the Fourth Amendment. In their Proposed Findings of Fact and Conclusions of Law, plaintiffs request the following:

"All searches must be made upon probable cause. Mere possession of a particular accessory creates no more than a suspicion of illegal drug activity. That suspicion will not ordinarily justify a drug search. By making the accessory illegal under the paraphernalia law, the probable cause necessary for an otherwise illegal search is then provided."

The Court cannot agree with this reasoning. A search warrant may issue only upon a showing of probable cause. *See e. g. Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Probable cause exists when the facts and circumstances are sufficient to believe that seizable objects are located at the place to be searched. *See Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Absent the requisite intent, an object cannot be considered drug paraphernalia, and consequently is not seizable. Therefore, under S.B. 114 a warrant will not issue without probable cause to believe that an individual is in possession of an object and the object is "used or intended for use" with a controlled dangerous substance. Mere possession of an object is not sufficient, and absent the required intent lacks the probable cause necessary for a

search warrant under the Fourteenth Amendment.

As the Court stated in *Delaware Accessories Trade Assn. v. Gebelein, supra,* at 296: "... nothing in the Act ... dilutes the Fourth Amendment probable cause standard and there is no reason to believe that its application will be any more difficult or uncertain in the context of the Act than in the context of any of the other multitude of statutes that proscribe otherwise innocent conduct when accompanied by the intent to commit or facilitate a crime."

### UNLAWFUL TAKING

■ Plaintiffs argue that the prohibitions contained in the Act will sanction an unlawful taking of property without just compensation and without due process of law. The Court finds no basis for this argument. While the statute contains no grandfather clause that would protect objects currently in the hands of plaintiffs, it remains that an object does not become drug paraphernalia without the requisite intent that it be used in connection with controlled dangerous substances. Therefore, a grandfather clause would be meaningless and defeat the purpose of the Act.

The Court concludes that since the proscribed intent is necessary to constitute a violation of this Act, the forfeiture provisions contained in Section 4 do not result in an unlawful taking prohibited by the Fourteenth Amendment.

### EQUAL PROTECTION

■ Plaintiffs argue that the statute violates the Equal Protection Clause "because they will necessarily result in discriminatory enforcement. Although these statutes do not facially single out for attention the so-called head shops, it is unquestionably these business establishments to which the statutes are admittedly directed...." Brief of plaintiff at 28.

If an ordinance restricts a fundamental interest such as voting, *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), or involves a suspect classification such as race, *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Court must carefully scrutinize it to determine whether the state has a compelling interest in the end it seeks to attain and whether the means used are closely congruent to that end. *See e. g. In Re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). In this case neither a fundamental right nor a suspect classification is involved. Therefore, traditional equal protection analysis provides the standard of review. As the Supreme Court stated in *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976):

"Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude... In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines ... in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment."

The authority of the Oklahoma legislature to regulate the use of controlled substances "is too firmly established to be successfully called into question." *Robinson v. California,* 370 U.S. 660, 664, 82 S.Ct. 1417, 1419, 8 L.Ed.2d 758 (1962). Because the states' regulation of the use and distribution of drug paraphernalia is rationally related to this manifestly legitimate state interest, the plaintiffs' Equal Protection argument is unpersuasive.

This question has been raised in other litigation regarding the Model Act and perhaps best treated in *Parma* (N.D.Ohio E.D.) where the Court stated:

"The plaintiff argues that the ordinance violates the Equal Protection Clause of the Fourteenth Amendment because it is directed only at 'head shops' and not the many other establishments in Parma which distribute, sell or advertise items which are identical or functionally equivalent to the merchandise sold by it. The court concludes that this argument is meritless for two reasons. First, the basic premise of the argument is false; the Ordinance applies to all users, distributors or advertisers of drug paraphernalia who act with the requisite intent, not just 'head shops.' Second, the Ordinance does not violate the Equal Protection Clause because it is rationally related to a legitimate municipal goal."

### RIGHT OF PRIVACY

 Plaintiffs contend that the prohibitions contained in S.B. 114 infringe upon the privacy interests of potential purchasers of certain items sold by plaintiffs. Brief of plaintiffs at 29–30. However, it is settled law that an individual party has no standing to challenge an Act on the ground that it may violate the privacy rights of third party purchasers in circumstances not currently before the Court. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Therefore, the Court concludes that the plaintiffs' argument in regard to the right of privacy is without merit. *Accord. Delaware Accessories Trade Assn. v. Gebelein, supra.*

### COMMERCE CLAUSE

 The commerce clause, Article I, § 8 of the United States Constitution, grants to Congress the power to regulate foreign and interstate commerce. This affirmative grant also imposes limits upon state power to regulate commerce over which Congress has primary responsibility. *Great Western United Corporation v. Kidwell*, 577 F.2d 1256 (5th Cir. 1978), rev. on other grounds, 443 U.S. 176, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1980). Nevertheless, not every exercise of state power with some impact on interstate commerce is invalid. "Rather, in areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause—where local and national powers are concurrent—the Court in absence of congressional guidance is called upon to make 'delicate adjustment of the conflicting state and federal claims.'"

The proper statutory analysis was articulated by the Supreme Court in *Pike v. Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) as follows:

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852, 856 [78 A.L.R.2d 1294]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local intent involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

In the present case, S.B. 114 does not single out interstate commerce for special treatment but regulates all commerce "even-handedly." Furthermore, the Act seeks to reduce the glorification of drug abuse, a manifestly legitimate local public interest. Finally, the statute affects only a minor portion of the commercial market and consequently its impact on interstate commerce is at most incidental. Therefore, S.B. 114 does not violate the Commerce Clause. As the Court concluded in *Mid-Atlantic Accessories Trade Association v. State of Maryland, supra* at 849:

"The act prohibits commerce only in items intended to be used with illegal drugs and is no more an interference with interstate commerce than are ... statutes prohibiting the sale and use of illegal drugs themselves ..."

*FIRST AMENDMENT*

APPENDIX

Plaintiffs assert that S.B. 114 is an impermissible ban on "commercial speech" and therefore violative of the First Amendment. In brief, plaintiffs argue:

"Once it is recognized that the use, or offer for sale of paraphernalia constitutes commercial speech and that such speech is entitled to protection under the First Amendment, it becomes clear that the instant statutes cannot stand, for they are not supported by any constitutionally acceptable justification."

Plaintiffs' Memorandum of Points and Authorities at 17.

Commercial speech has been defined alternately as "expression related solely to the economic interests of the speaker and its audience", and "speech proposing a commercial transaction." *See Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 561, 562, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). In the present case, the Act bans the sale and possession of items used or intended for use with controlled dangerous substances. However, the legislature deleted the provisions of the Model Act prohibiting the advertisement and promotion of "drug paraphernalia." [5] The Act does not ban any item absent the proscribed intent. Nor does the statute prohibit the expression of views by the possessor of any object, whether or not such object is "drug paraphernalia." S.B. 114 simply does not affect commercial speech. Therefore, the Act is not violative of the First Amendment.

### IX.

With the judicial excision of certain terms, in accordance with the severability provisions of Section 6, S.B. 114 may be construed in a manner consistent with the United States Constitution.[6] Therefore, the Court concludes that the Act is valid.

IT IS SO ORDERED.

---

5. The Model Drug Paraphernalia Act provides in applicable part:

 "... It is unlawful for any person to place in any newspaper, magazine, handbill, or other publication any advertisement, knowing, or under circumstances where one reasonably should know, that the purpose of the

ENROLLED SENATE BILL NO. 114

AN ACT RELATING TO PUBLIC HEALTH AND SAFETY; AMENDING 63 O.S.1971, SECTIONS 2–101, AS AMENDED BY SECTION 1, CHAPTER 133, O.S.L.1975, 2–405 AND 2–503, AS AMENDED BY SECTION 1, CHAPTER 194, O.S.L.1978 (63 O.S.SUPP.1980, SECTIONS 2–101 AND 2–503), WHICH RELATE TO DRUGS; DEFINING AND ADDING TERMS; ADDING CRITERIA FOR JUDICIAL DETERMINATION OF WHAT CONSTITUTES DRUG PARAPHERNALIA; PROHIBITING USE OF CERTAIN SUBSTANCES; MODIFYING CERTAIN PROHIBITED ACTS; PROVIDING EXCEPTIONS; ADDING PROHIBITED ACTS; PROVIDING PENALTIES; PROVIDING FOR FORFEITURE OF CERTAIN ITEMS; SPECIFYING ADDITIONAL PROPERTY SUBJECT TO FORFEITURE; DIRECTING CODIFICATION; PROVIDING SEVERABILITY; AND DECLARING AN EMERGENCY.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:

SECTION 1. 63 O.S.1971, Section 2–101, as amended by Section 1, Chapter 133, O.S. L.1975 (63 O.S.Supp.1980, Section 2–101), is amended to read as follows:

Section 2–101. As used in this act:

1. "Administer" means the direct application of a controlled dangerous substance, whether by injection, inhalation, ingestion or any other means, to the body of a patient, animal or research subject by:

 a. a practitioner (or, in his presence, by his authorized agent), or

 b. the patient or research subject at the direction and in the presence of the practitioner.

---

advertisement, in whole or in part, is to promote the sale of objects designed or intended for use as drug paraphernalia."

6. Appended is a copy of the Act showing the provisions excised in accordance with this opinion.

2. "Agent" means a peace officer appointed by and who acts in behalf of the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control or an authorized person who acts on behalf of or at the direction of a person who manufactures, distributes, dispenses, prescribes, administers or uses for scientific purposes controlled dangerous substances but does not include a common or contract carrier, public warehouseman or employee thereof, or a person required to register under this act.

3. "Board" means the Advisory Board to the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control.

4. "Bureau of Narcotics and Dangerous Drugs" means the Bureau of Narcotics and Dangerous Drugs, United States Department of Justice.

5. "Coca leaves" includes cocaine and any compound, manufacture, salt, derivative, mixture or preparation of coca leaves, except derivatives of coca leaves which do not contain cocaine or ecgonine.

6. "Commissioner" or "Director" means the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control.

7. "Control" means to add, remove or change the placement of a drug, substance or immediate precursor under this act.

8. "Controlled dangerous substance" means a drug, substance or immediate precursor in Schedules I through V of this act.

9. "Counterfeit substance" means a controlled substance which, or the container or labeling of which without authorization, bears the trademark, trade name or other identifying marks, imprint, number or device or any likeness thereof of a manufacturer, distributor or dispenser other than the person who in fact manufactured, distributed or dispensed the substance.

10. "Deliver" or "delivery" means the actual, constructive or attempted transfer from one person to another of a controlled dangerous substance, whether or not there is an agency relationship.

11. "Dispense" means to deliver a controlled dangerous substance to an ultimate user or human research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering, packaging, labeling or compounding necessary to prepare the substance for such distribution. "Dispenser" is a practitioner who delivers a controlled dangerous substance to an ultimate user or human research subject.

12. "Distribute" means to deliver other than by administering or dispensing a controlled dangerous substance.

13. "Distributor" means a person who distributes.

14. "Drug" means articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of any article specified in this paragraph; but does not include devices or their components, parts or accessories.

15. "Drug dependent person" means a person who is using a controlled dangerous substance and who is in a state of psychic or physical dependence, or both, arising from administration of that controlled dangerous substance on a continuous basis. Drug dependence is characterized by behavioral and other responses which include a strong compulsion to take the substance on a continuous basis in order to experience its psychic effects, or to avoid the discomfort of its absence.

16. "Immediate precursor" means a substance which the Director has found to be and by regulation designates as being the principal compound commonly used or produced primarily for use, and which is an immediate chemical intermediary used, or likely to be used, in the manufacture of a controlled dangerous substance, the control of which is necessary to prevent, curtail or limit such manufacture.

17. "Laboratory" means a laboratory approved by the Director as proper to be entrusted with the custody of controlled dangerous substances and the use of controlled dangerous substances for scientific and medical purposes and for purposes of instruction.

18. "Manufacture" means the production, preparation, propagation, compounding or processing of a controlled dangerous substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis. "Manufacturer" includes any person who packages, repackages or labels any container of any controlled dangerous substance, except practitioners who dispense or compound prescription orders for delivery to the ultimate consumer.

19. "Marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture or preparation of such plant, its seeds or resin, but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil or cake, or the sterilized seed of such plant which is incapable of germination.

20. "Medical purpose" means an intention to utilize a controlled dangerous substance for physical or mental treatment, diagnosis or for the prevention of a diseased condition not in violation of any state or federal law and not for the purpose of satisfying physiological or psychological dependence or other abuse.

21. "Narcotic drug" means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

a. opium, coca leaves and opiates;

b. a compound, manufacture, salt, derivative or preparation of opium, coca leaves or opiates;

c. a substance (and any compound, manufacture, salt, derivative or preparation thereof) which is chemically identical with any of the substances referred to in clauses a. and b., except that the words "narcotic drug" as used in this act shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine.

22. "Opiate" means any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining liability. It does not include, unless specifically designated as controlled under this act, the dextrorotatory isomer of 3-methoxy-n-methyl-morphinan and its salts (dextromethorphan). It does include its racemic and levorotatory forms.

23. "Opium poppy" means the plant of the species Papaver somniferum L., except the seeds thereof.

24. "Peace officer" means a police officer, sheriff, deputy sheriff, district attorney's investigator or any other person elected or appointed by law to enforce any of the criminal laws of this state or of the United States.

25. "Person" means individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity.

26. "Poppy straw" means all parts, except the seeds, of the opium poppy, after mowing.

27. "Practitioner" means:

a. a physician, dentist, podiatrist, veterinarian, scientific investigator or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to, use for scientific purposes or administer a controlled dangerous substance in the course of professional practice or research in this state; or

b. a pharmacy, hospital, laboratory or other institution licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to, use for scientific purposes or administer a controlled dangerous substance in the course of professional practice or research in this state.

28. "Production" includes the manufacture, planting, cultivation, growing or harvesting of a controlled dangerous substance.

29. "State" means the State of Oklahoma or any other state of the United States.

30. "Ultimate user" means a person who lawfully possesses a controlled dangerous substance for his own use or for the use of a member of his household or for administration to an animal owned by him or by a member of his household.

31. "Act" means the Uniform Controlled Dangerous Substances Act, as defined in Sections 2–101 through 2–608 of Title 63.

32. "Drug paraphernalia" means all equipment, products and materials of any kind which are used or intended for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body, a controlled dangerous substance in violation of this act. It includes, but is not limited to:

a. kits used or intended for use in planting, propagating, cultivating, growing or harvesting of any species of plant which is a controlled dangerous substance or from which a controlled dangerous substance can be derived;

b. kits used or intended for use in manufacturing, compounding, converting, producing, processing or preparing controlled dangerous substances;

c. isomerization devices used or intended for use in increasing the potency of any species of plant which is a controlled dangerous substance;

d. testing equipment used or intended for use in identifying, or in analyzing the strength, effectiveness or purity of controlled dangerous substances;

e. scales and balances used or intended for use in weighing or measuring controlled dangerous substances;

f. dilutents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose and lactose, used or intended for use in cutting controlled dangerous substances;

g. separation gins and sifters used or intended for use in removing twigs and seeds from, or in otherwise cleaning or refining, marihuana;

h. blenders, bowls, containers, spoons and mixing devices used or intended for use in compounding controlled dangerous substances;

i. capsules, balloons, envelopes and other containers used or intended for use in packaging small quantities of controlled dangerous substances;

j. containers and other objects used or intended for use in parenterally injecting controlled dangerous substances into the human body;

k. hypodermic syringes, needles and other objects used or intended for use in parenterally injecting controlled dangerous substances into the human body;

l. objects used or intended for use in ingesting, inhaling or otherwise introducing marihuana, cocaine, hashish or hashish oil into the human body, such as:

(1) metal, wooden, acrylic, glass, stone, plastic or ceramic pipes with or without screens, permanent screens, hashish heads or punctured metal bowls;

(2) water pipes;

(3) carburetion tubes and devices;

(4) smoking and carburetion masks;

(5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;

(6) miniature cocaine spoons and cocaine vials;

(7) chamber pipes;

(8) carburetor pipes;

(9) electric pipes;

(10) air-driven pipes;

(11) chillums;

(12) bongs;

(13) ice pipes or chillers.

Provided however, drug paraphernalia shall not include separation gins intended for use in preparing tea or spice, clamps ~~commonly~~ used for constructing electrical equipment, water pipes designed for ornamentation or pipes designed for smoking tobacco.

SECTION 2. In determining whether an object is "drug paraphernalia", a court shall consider, in addition to all other logically relevant factors, the following:

1. Statements by an owner or by anyone in control of the object concerning its use;

2. The proximity of the object, in time and space, to a direct violation of this act;

3. The proximity of the object to controlled dangerous substances;

4. The existence of any residue of controlled dangerous substances on the object;

5. Direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons who intend to use the object to facilitate a violation of this act; the innocence of an owner, or of anyone in control of the object, as to a direct violation of this act shall not prevent a finding that the object is drug paraphernalia;

6. Instructions, oral or written, provided with the object concerning its use;

7. Descriptive materials accompanying the object which explain or depict its use;

8. The manner in which the object is displayed for sale;

9. Whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products;

10. Direct or circumstantial evidence of the ratio of sales of the object or objects to the total sales of the business enterprise;

11. The existence and scope of legitimate uses for the object in the community; and

12. Expert testimony concerning its use.

SECTION 3. 63 O.S.1971, Section 2–405, is amended to read as follows:

Section 2–405. A. No person shall use tincture of opium, tincture of opium camphorated, or any derivative thereof, by the hypodermic method, either with or without a medical prescription therefor.

B. ~~No person shall use or possess drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled dangerous substance in violation of this act who cannot show any medical or other lawful need requiring the same, except those persons holding an unrevoked license in the professions of podiatry, dentistry, medicine, nursing, optometry, osteopathy, veterinary medicine or pharmacy.~~

C. No person shall deliver, possess or manufacture drug paraphernalia knowing, ~~or under circumstances in which~~ it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled dangerous substance in violation of this act.

D. Any person eighteen (18) years of age or over who violates subsection C of this section by delivering drug paraphernalia to a person under eighteen (18) years of age who is at least three (3) years his junior shall be guilty of a felony.

E. Any person who violates subsections A, B or C of this section is guilty of a misdemeanor punishable by imprisonment in the county jail for not more than one (1) year or a fine of not more than One Thousand Dollars ($1,000.00), or both such fine and imprisonment.

SECTION 4. 63 O.S.1971, Section 2–503, as amended by Section 1, Chapter 194, O.S. L.1978 (63 O.S.Supp.1980, Section 2–503), is amended to read as follows:

Section 2–503. The following shall be subject to forfeiture:

1. All controlled dangerous substances which have been manufactured, distributed, dispensed, acquired, concealed or possessed in violation of this act.

2. All raw materials, products and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, importing or exporting any controlled dangerous substance in violation of the provisions of this act.

3. All property which is used, or intended for use, as a container for property described in paragraphs 1 and 2 of this section.

4. All conveyances, including aircraft, vehicles or vessels, which are used to transport or conceal, for the purpose of distribution as defined in Section 2–101 of this title, or in any manner facilitate the transportation for the purpose of sale or receipt of property described in paragraphs 1 or 2 of this section or when such property is unlawfully possessed by an occupant thereof, except that:

 a. no conveyance used by a person as a common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this act unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to a violation of this act; and

 b. no conveyance shall be forfeited under the provisions of this section by reason of any act or omission established by the owner thereof to have been committed or omitted without the knowledge or consent of such owner, and by any person other than such owner while such conveyance was unlawfully in the possession of a person other than the owner in violation of the criminal laws of the United States, or of any state.

5. All books, records and research, including formulas, microfilm, tapes and data which are used in violation of this act.

6. All drug paraphernalia as defined by this act.

SECTION 5. Section 2 of this act shall be codified in the Oklahoma Statutes as Section 2–101.1 of Title 63, unless there is created a duplication in numbering.

SECTION 6. The provisions of this act are severable and if any part or provision shall be held void the decision of the court so holding shall not affect or impair any of the remaining parts or provisions of this act.

SECTION 7. It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, by reason whereof this act shall take effect and be in full force from and after its passage and approval.